**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| Naomy Altagracia Gonzalez Rodriguez, Molla Brown, and Thomas Rodriguez individually on behalf of themselves and all others similarly situated, | : : : : : : | Case No. 1:22-cv-02991-JPO |
| Plaintiffs, v. | : : : : : | **FIRST AMENDED CLASS ACTION COMPLAINT** <br> **JURY TRIAL DEMANDED** |
| Walmart Inc., | : : : | |
| Defendant. | : : | |

Plaintiffs Naomy Altagracia Gonzalez Rodriguez, Molla Brown, and Thomas Rodriguez (hereafter "Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendant Walmart Inc., ("Defendant"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on their personal knowledge.

## NATURE OF THE ACTION

1.      This action seeks to remedy the deceptive and misleading business practices of Walmart Inc. (hereinafter "Defendant") with respect to the marketing and sale of Defendant's lidocaine[1] (the "Lidocaine Patches") as well as Defendant's lidocaine creams[2] (the "Lidocaine Creams," and collectively, the "Lidocaine Products").

---

[1] The Lidocaine Patches include Defendant's "Equate Pain Relieving Patches"; and "Equate Lidocaine + Menthol Patches."
[2] The Lidocaine Creams include Defendant's "Equate Pain Relief Cream (Roll On)"; and "Equate Pain Relieving Cream Lidocaine."

2.      Lidocaine is a topical anesthetic that is used to treat pain by blocking the transmission of pain signals from nerve endings in the skin to the spinal cord and brain. Specifically, lidocaine functions by blocking sodium channels located on nerve endings which prevents action potential from propagating in the nerve cell and thereby interrupts the transmission of pain signals. As such, for Defendant's Lidocaine Patches to work to relieve pain, they must stay adhered to consumers' skin.

3.      Defendant takes advantage of consumers by falsely representing on the packaging of the Lidocaine Products that they deliver a "Maximum Strength" dose of lidocaine and that the Lidocaine Patches relieves pain through a "Stay-put flexible patch," that "Lasts Up To 12 Hours" as depicted below:









4.      Defendant's claims, representations, and warranties are false and misleading. As explained in further detail below, the Lidocaine Patches systematically peel off consumers' bodies within a short time after being properly applied—thus depriving consumers of the advertised benefits (i.e., they don't provide pain relief that is "maximum strength," through a "stay-put flexible patch," that "lasts up to 12 hours" as promised).

5.      Moreover, Defendant represents that the Lidocaine Products offer a "maximum strength" dose of lidocaine; however, Defendant's "maximum strength" claims are false and deceptive because there are other over-the-counter ("OTC") and prescription lidocaine creams and patches which contain and deliver a higher concentration of lidocaine milligrams per gram of cream (for the Lidocaine Creams) and a higher amount of lidocaine delivered per square inch of application to consumers' bodies (for the Lidocaine Patches). Furthermore, Defendant's Lidocaine Patches do not contain, nor do they deliver, a higher amount of lidocaine than other lidocaine patches without the "maximum strength" labeling.

6.      Plaintiffs and those similarly situated ("Class Members") relied on Defendant's representations when purchasing the Lidocaine Products. Had they known that Defendant's representations were false, they would not have purchased Defendant's Lidocaine Products, or they would have paid less for them. Furthermore, Plaintiffs and the proposed Class Members paid a premium for Defendant's Lidocaine Products because their price was inflated as a result of Defendant's false and misleading claims regarding their intrinsic qualities. As such Plaintiffs and the proposed Class Members suffered an injury in fact as a result of Defendant's misleading and deceptive practices.

7

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction under the Class Action Fairness Act,

("CAFA") 28 U.S.C. section §1332(d) in that (1) this is a class action involving more than 100

Class Members; (2) there is diversity because Plaintiffs are citizens of New York and Defendant

Walmart Inc., is a citizen of Arkansas; and (3) the amount in controversy is in excess of

$5,000,000, exclusive of interests and costs.

8.     This Court has personal jurisdiction over Defendant because Defendant conducts

and transacts business in the state of New York, contracts to supply goods within the state of

New York, and supplies goods within the state of New York. Furthermore, a substantial portion

of the events giving rise to Plaintiffs' claims occurred in New York.

9.     Venue is proper because Plaintiffs Naomy Altagracia Gonzalez Rodriguez and

Molla Brown reside in Bronx, New York and many Class Members reside in the Southern

District of New York, and throughout the state of New York. Defendant does substantial

business in this district and a substantial part of the events or omissions giving rise to the

Classes' claims occurred in this district.

## THE PARTIES

10.     Plaintiff Naomy Altagracia Gonzalez Rodriguez is an individual consumer who,

at all times material hereto, was a citizen of New York State.  Plaintiff Gonzalez Rodriguez

resides in Bronx, NY.  Plaintiff Gonzalez Rodriguez purchased the Lidocaine Patches for her

personal use during the applicable statute of limitations period in Defendant's brick-and-mortar

locations throughout New York City, NY, Westchester County, NY and Secaucus, NJ. Plaintiff

8

Gonzalez Rodriguez's most recent purchases were Defendant's Equate Pain Relieving Patches, which she purchased for approximately $6.99 in 2021, and Defendant's Equate Lidocaine + Menthol Patches, which she purchased for approximately $4.99 in 2022. Prior to purchasing the Lidocaine Patches, Plaintiff Gonzalez Rodriguez saw and read their packaging which stated that they provide pain relief, that is "maximum strength," through a "stay-put flexible patch," that "lasts up to 12 hours." Plaintiff Gonzalez Rodriguez purchased the Lidocaine Patches believing Defendant's representations that the Lidocaine Patches provide pain relief, that is "maximum strength," through a "stay-put flexible patch," that "lasts up to 12 hours." Plaintiff Gonzalez Rodriguez also relied on the "maximum strength" representation by believing that the Lidocaine Patches indeed contained and delivered the maximum amount of lidocaine available in patch form with or without a prescription. Despite Defendant's representations, the Lidocaine Patches that Plaintiff Gonzalez Rodriguez purchased did not contain, nor did they deliver, a "maximum strength" dose of lidocaine. Furthermore, the Lidocaine Patches that Plaintiff Gonzalez Rodriguez purchased were not sufficiently "flexible" to withstand regular daily activities and they systematically peeled off her body well before the represented 12 hours, delivering little to no pain relief to her body. Had Plaintiff Gonzalez Rodriguez known that the Lidocaine Patches representations were false, she would not have purchased the Lidocaine Patches or would have paid less for them. Additionally, in making her purchases, Plaintiff Gonzalez Rodriguez paid a price premium because the price of Defendant's Lidocaine Patches was inflated as a result of the false and misleading claims regarding their intrinsic qualities.

9

11.     Plaintiff Molla Brown is an individual consumer who, at all times material hereto, was a citizen of New York State. Plaintiff Brown resides in Bronx, NY. Plaintiff Brown purchased the Lidocaine Products for her personal use during the applicable statute of limitations in Defendant's brick-and-mortar locations throughout Rockland County, NY and Hudson County, NJ. Plaintiff Brown's most recent purchases were Defendant's Equate Pain Relieving Patches, which she purchased for approximately $6.99 in 2021, and Defendant's Equate Pain Relieving Cream, which she purchased for approximately $4.99 in 2022. Prior to purchasing the Lidocaine Patches, Plaintiff Brown saw and read their packaging which stated that they provide pain relief, that is "maximum strength," through a "stay-put flexible patch," that "lasts up to 12 hours." Plaintiff purchased the Lidocaine Patches believing Defendant's representations that the Lidocaine Patches provide pain relief, that is "maximum strength," through a "stay-put flexible patch," that "lasts up to 12 hours." Plaintiff Brown also relied on the "maximum strength" representation by believing that the Lidocaine Products indeed contained and delivered the maximum amount of lidocaine available in the market with or without a prescription. Despite Defendant's representations, the Lidocaine Products that Plaintiff Brown purchased did not contain, nor did they deliver, a "maximum strength" dose of lidocaine. Furthermore, the Lidocaine Patches that Plaintiff Brown purchased were not sufficiently "flexible" to withstand regular daily activities and they systematically peeled off her body well before the represented 12 hours, delivering little to no pain relief to her body. Had Plaintiff Brown known that the Lidocaine Products representations were false, she would not have purchased the Lidocaine Products or would have paid less for them. Additionally, in making her purchases, Plaintiff

10

Brown paid a price premium because the prices of Defendant's Lidocaine Products were inflated as a result of the false and misleading claims regarding their intrinsic qualities.

12.     Plaintiff Thomas Rodriguez is an individual consumer who, at all times material hereto, was a citizen of New York State. Plaintiff Rodriguez resides in Nassau County, NY. Plaintiff Rodriguez purchased the Lidocaine Patches for his personal use during the applicable statute of limitations in Defendant's brick-and-mortar locations throughout Nassau County, NY. Plaintiff Rodriguez's most recent purchase was Defendant's Equate Pain Relieving Patches, which he purchased for approximately $6.99 in 2022. Prior to purchasing the Lidocaine Patches, Plaintiff Rodriguez saw and read their packaging which stated that they provide pain relief, that is "maximum strength," through a "stay-put flexible patch," that "lasts up to 12 hours." Plaintiff Rodriguez purchased the Lidocaine Patches believing Defendant's representations that the Lidocaine Patches provide pain relief, that is "maximum strength," through a "stay-put flexible patch," that "lasts up to 12 hours." Plaintiff Rodriguez also relied on the "maximum strength" representation by believing that the Lidocaine Products indeed contained and delivered the maximum amount of lidocaine available in the market with or without a prescription. Despite Defendant's representations, the Lidocaine Products that Plaintiff Rodriguez purchased did not contain, nor did they deliver, a "maximum strength" dose of lidocaine. Furthermore, the Lidocaine Patches that Plaintiff Rodriguez purchased were not sufficiently "flexible" to withstand regular daily activities and they systematically peeled off his body well before the represented 12 hours, delivering little to no pain relief to his body. Had Plaintiff Rodriguez known that the Lidocaine Products representations were false, he would not have purchased the

Lidocaine Products or would have paid less for them. Additionally, in making his purchases, Plaintiff Rodriguez paid a price premium because the prices of Defendant's Lidocaine Products were inflated as a result of the false and misleading claims regarding their intrinsic qualities.

13.     Defendant, Walmart Inc., is a corporation with its principal place of business in Bentonville, Arkansas. Walmart Inc. is authorized to do business in New York.  Walmart Inc. distributes its products, including the Lidocaine Products, throughout the United States. Walmart Inc.'s line of lidocaine patches and creams, including the Lidocaine Products purchased by Plaintiffs and Class Members, are available at retail stores throughout New York and the United States. Defendant manufactures, markets, advertises, and distributes the Lidocaine Products throughout the United States. Defendant created and/or authorized the false, misleading, omitting, and deceptive advertisements, packaging, and labeling of their Lidocaine Products.

## FACTUAL BACKGROUND

### *Introduction of Over-the-Counter Lidocaine Patches to the Public*

14.     In 1999, the FDA first approved a lidocaine patch to help ameliorate pain associated with post-herpetic neuralgia ("PHN"), an acute complication of shingles. The FDA has since approved other lidocaine patches to treat PHN.

15.     Doctors soon discovered that lidocaine patches are effective in treating general neuropathic pain—like muscle and spinal aches—and began prescribing the patches off-label for such uses. A 2012 study found that over 82% of the usage of prescription lidocaine patches were off-label.

16.     As the use of off-label lidocaine patches continued to grow, the pharmaceutical companies behind the products Salonpas and Aspercreme decided to capitalize on the market by introducing the first over-the-counter ("OTC") lidocaine patches to the public in 2016.[3] These companies engaged in aggressive marketing campaigns—including doctors in white coats explaining that the newly introduced OTC lidocaine patches are virtually identical in all respects to prescription-strength lidocaine patches (at a fraction of the price). These advertisements were, and continue to be, widely and pervasively disseminated through television advertisements, shows, and social media. As a result, a substantial number of consumers (and doctors alike) believe that OTC lidocaine patches are equally effective to their prescription counterparts:

---

[3] https://pink.pharmaintelligence.informa.com/PS119368/With-OTC-Lidocaine-Salonpas-Takes-Path-Of-Less-Resistance-To-Market (last accessed May 31, 2022).







17.     On July 1, 2017, within a year after the first OTC lidocaine patch was introduced into the market, Defendant first began selling its Lidocaine Products[4]—piggybacking from Salonpas popularity by referencing the product directly on the Lidocaine Products' packaging. Defendant introduced its Lidocaine Products under the auspices of being compliant with the U.S. Food and Drug Administration ("FDA") regulations. As explained in greater detail below,

---

[4] https://www.accessdata.fda.gov/spl/data/f15825a9-4e1a-46aa-b719-1c230ce05462/f15825a9-4e1a-46aa-b719-1c230ce05462.xml (last accessed June 22, 2022).

however, Defendant's Lidocaine Products flout FDA regulations and are also independently

deceptive and misleading.

***FDA Regulations Applicable to Defendant's OTC Lidocaine Patches***

18.     The FDA regulates most OTC medications through a monograph process. A

monograph is a detailed set of regulations that describe the conditions under which a category of

drugs may be marketed without a prescription. The FDA has described a monograph as a kind of

"recipe book" that sets out the FDA-approved active ingredients for a given therapeutic class of

over-the-counter drugs and specifies acceptable doses, formulations, and labeling.[5]

19.     In 1983, the FDA published a Tentative Final Monography for External Analgesic

Drug Products for Over-the-Counter Human Use, 48 Fed. Reg. 5852-01 (Feb. 8, 1983) (the

"1983 TFM"), which provides the applicable requirements for the labeling, ingredients, uses, and

doses of OTC external analgesic products. Specifically, the 1983 TFM proscribed the use of

lidocaine at 4% in the "dosage form" of "cream, lotion, or ointment." *Id.* at Subpart C §

348.50(b)(2).

20.     Because the 1983 TFM did not contemplate, nor did it regulate, the use of patches

or plasters to administer the drugs permitted therein, in 2013, the FDA issued a proposed rule

(the "2013 Proposed Rule") which explicitly sought to exclude the use of patches as a dosage

form under the 1983 TFM. *See* External Analgesic Drug Products for Over-the-Counter Human

Use; Reopening of the Administrative Record and Amendment of Tentative Final Monograph,

---

[5] https://www.fda.gov/drugs/types-applications/drug-applications-over-counter-otc-drugs (last
accessed June 22, 2022)

68 Fed. Reg. 42324-01, 42326 (July 17, 2003). Specifically, the 2013 Proposed Rule concluded that patches, including lidocaine patches, were not "generally recognized as safe and effective" for OTC sales due to insufficient information concerning: "[t]he safe and effective concentration of the drug ingredient(s)," "how often the plaster or poultice needs to be changed for effective use," "and the "[l]abeling of currently marketed products." *Id.* As a result, the 2013 Proposed Rule sought to amend the 1983 TFM to include the following language "[t]he active ingredients of the product consist of any of the following, within the established concentration for each ingredient, **but not for use in a patch**, plaster, or poultice dosage form." *Id.* (emphasis added).

21.     The FDA presumably issued the 2003 proposed rule because, unlike creams and ointments, the amount of an active ingredient contained in a patch cannot be discerned by looking at a percentage concentration alone. For instance, under the 1983 TFM, the strength of lidocaine products could be easily calculated by multiplying the 4% lidocaine limit per 1 gram of a cream or ointment (i.e., 40 milligrams of lidocaine per gram applied to the skin). Lidocaine patches, however, use transdermal/topical delivery systems ("TDS"): a different drug delivery method whose actual strength cannot be discerned using the 1983 TFM 4% lidocaine limit. Unlike lidocaine creams and ointments, TDS patches are comprised of three main parts: (1) an outer protective backing membrane, (2) a drug-in-adhesive layer, and (3) a release liner that controls the rate and extent of drug administration: [6]

---

[6] https://www.fda.gov/media/132674/download (last accessed June 22, 2022).

**Figure 1. Matrix Type Transdermal or Topical Delivery System**



22.    Due to their composition, in order for TDS patches to work, they must be able to

adhere to a person's skin throughout the labeled wear period and be able to dispense the

medication throughout the time represented therein. As currently marketed, manufacturers of

lidocaine patches attempt to shoehorn their patches under the 1983 TFM 4% benchmark based

on the "mass of drug relative to the mass of the adhesive per patch."[7] However, unlike creams

and ointments where the amount of lidocaine delivered to the skin of a consumer can be

measured directly upon application, the amount of lidocaine contained in, or delivered by, a

lidocaine patch cannot be determined based on the arbitrary measure of a patch's drug-to-

adhesive ratio. This unit of measurement is particularly problematic because it allows

manufacturers, like Defendant, to arbitrarily alter the total mass of lidocaine contained in their

lidocaine patches merely by changing the thickness of the patches' backing membrane without

changing its dimensions (i.e., the surface area applied to a consumer's skin).[8]

---

[7] *See* Citizen Petition from Scilex Pharmaceuticals Inc. at pg. 19.
https://www.regulations.gov/document/FDA-2019-P-0417-0001 (last accessed June 23, 2022).
[8] "It is emphasized that most of these patch products are labeled as a percentage strength, without
providing the total drug content per patch. For other topical dosage forms like creams, ointments,
and lotions, the amount of drug administered can easily be determined by weighing the mass of
product and applying the strength factor as illustrated in the table below. In contrast, the amount
of drug applied for patch products cannot easily be determined because the exact mass of

23.     This drug-to-adhesive ratio is also independently misleading to consumers and doctors alike, who ordinarily expect that the percentage of an active ingredient in a drug has a direct correlation to the quantity, or efficacy, of that ingredient within the drug. Defendant's drug-to-adhesive fanciful creation to skew around the 1983 TFM does not communicate this pertinent information to consumers when making their purchases.

**_Defendant's Misleading Marketing and Packaging of its Lidocaine Products_**

24.     Defendant markets, sells, and distributes the Lidocaine Products through numerous retail stores and online marketplaces. On the packaging of the Lidocaine Products, Defendant represents that they deliver a "Maximum Strength" dose of lidocaine and that the Lidocaine Patches provide pain relief through a "Stay-Put Flexible Patch," that "Lasts Up to 12 Hours".

25.     By representing that the Lidocaine Products provide a "Maximum Strength" dose of lidocaine, Defendant induced Plaintiffs and the proposed Class Members into believing that the Lidocaine Products: (1) contain and deliver the maximum amount of lidocaine available in the market; and (2) that they are superior, or at least equivalent, in efficacy and results to OTC and/or prescription-strength lidocaine products.

---

adhesive applied cannot be estimated due to the contributing mass of the backing materials. In as much as patches are manufactured in a variety of sizes and thicknesses, the drug exposure from patches is unknown and cannot be estimated by reviewing the product label, unless the manufacturer discloses the drug mass. Many of the patch products exclude this from their labels, and the absence of this information on unapproved OTC product labels creates a safety risk." _Id._ at pg. 20.

26.     Furthermore, by representing that Lidocaine Patches are "Stay-Put Flexible" patches capable of providing pain relief for 12 hours—a very specific number—Defendant induced Plaintiffs and the proposed Class Members into believing that the Lidocaine Patches: (1) would reliably adhere to their bodies for 12 hours; (2) were sufficiently flexible to withstand regular activities for a person suffering from sore muscles (such as walking, stretching, and sleeping); and (3) would provide pain relief throughout the specified amount of time represented therein.[9]

27.     Despite those representations, however, Defendant's Lidocaine Patches: (1) systematically fail to adhere to its consumers' bodies for 12 hours; (2) are insufficiently flexible to withstand regular activities (such as walking, stretching, and sleeping); (3) fail to continuously relieve pain throughout the specified amount of time represented therein due to their partial or complete detachment.

---

[9] Defendant specifically intended that these representations be communicated to consumers— as evidenced by the additional elaboration that Defendant displays on its website:

"With four percent of the active ingredient, Lidocaine, in every patch, it only takes one to get up to 12-hours of pain relief." https://www.walmart.com/ip/Equate-Maximum-Strength-Lidocaine-Pain-Relieving-Patches-6-Count/121592299 (last accessed June 22, 2022).

"The Equate Maximum Strength Pain Patch compares to Salonpas Maximum Strength Lidocaine Patch active ingredient and provides longer pain relief by 4 hours…Each patch (3.93 x 5.5") lasts up to 12 hours of continuously providing pain relief." https://www.walmart.com/ip/Equate-Maximum-Strength-4-Lidocaine-Pain-Relieving-Patch-Odor-Free-6-Count/619096863 (last accessed June 22, 2022).

"The patch's no-mess, single-use application offers effortless convenience while the flexible stay-put design helps the patch stay intact throughout your daily activities." https://www.walmart.com/ip/Equate-Lidocaine-and-Menthol-Pain-Relief-Patch-5-Count/529149652 (last accessed June 22, 2022).

28.     In addition, none of Defendant's Lidocaine Products contain or deliver the maximum amount of lidocaine available in the market; and are not superior, or at least equivalent, in efficacy and results to other OTC and/or prescription-strength lidocaine products.

***Defendant's Knowledge of the Defective Lidocaine Patches***

29.     Defendant knew that its Lidocaine Patches did not live up to their adhesiveness representations based on hundreds of complaints posted on its website (www.walmart.com) which Defendant actively monitors. For example, on August 10, 2021, a purchaser of the Equate Pain Relieving Patches complained that the product "[d]oesn't stay on! The corners are constantly peeling up and then most of the patch starts to come off. I even used 2 in. tape and cleaned and dried the area well first. It didn't seem to have any effect on the pain."[10] Similarly, on September 24, 2021, another purchaser of the Equate Pain Relieving Patches expressed their frustration using the product, stating that they didn't "feel the medication is powerful either as with other brand[s]."[11] Similarly, purchasers of Defendant's Equate Lidocaine Cool and Heat Patch have expressed the same grievances regarding the product's defective adhesion. For example, on February 4, 2022, a purchaser of the Equate Lidocaine Cool and Heat Patch posted a review stating "do not buy these the patches are poorly made, the adhesive doesn't work they don't stay in your skin when you put them on. complete waste of money."[12] Since the date this lawsuit was first filed, over 1,000 consumers have expressed their frustration with using Defendant's

---

[10] https://www.walmart.com/reviews/product/121592299 (last accessed June 22, 2022).
[11] https://www.walmart.com/reviews/product/121592299?page=2 (last accessed June 22, 2022).
[12] https://www.walmart.com/reviews/product/529149652 (last accessed June 22, 2022).

Lidocaine Patches on popular websites, such as topclassactions.com, many of them actively seeking to be added as class members.[13]

30.     Furthermore, Defendant knew, or should have known, that its Lidocaine Patches were defectively designed based on FDA reports and scientific studies regarding the efficacy of the products.

31.     Specifically, the FDA issued a report that transdermal drug patches (such as the Lidocaine Patches) systemically fail to adhere to the body and thus do not provide the claimed pain relief.[14] Further, the FDA Adverse Events Reporting System reports that approximately 70% of concerns stemming from lidocaine patches involve their poor adhesion.[15]  This is in line with the above customer complaints regarding the Lidocaine Patches' lack of adhesion abilities

32.     Furthermore, a peer-reviewed study published in January of 2021 by the Journal of Pain Research found that 0% of generic prescription lidocaine patches had a >90% adhesion rate within a 12-hour testing interval. [16] Moreover, the authors found that the mean adhesiveness

---

[13] https://topclassactions.com/lawsuit-settlements/lawsuit-news/walmart-class-action-lawsuit-and-settlement-news/walmart-walgreens-class-actions-allege-lidocaine-patches-dont-work-as-promised/ (last accessed June 22, 2022).

[14] *See* Yellela S.R. Krishnaiah *FDA Perspectives on Product Quality of Transdermal Drug Delivery Systems*, PhD Division of Product Quality Research OTR/OPQ/CDER US Food and Drug Administration Silver Spring, MD, USA AAPS 2015_Sunrise Session (2015). https://healthdocbox.com/Deafness/74997073-Fda-perspectives-on-product-quality-of-transdermal-drug-delivery-systems.html (last accessed June 22, 2022).

[15] *See* Gudin J, Nalamachu S. *Utility of lidocaine as a topical analgesic and improvements in patch delivery systems*. *Postgrad Med*. 2020;132(1):28–36. doi:10.1080/00325481.2019.1702296 https://www.tandfonline.com/doi/full/10.1080/00325481.2019.1702296 (last accessed June 22, 2022).

[16] *See* Gudin J, Webster LR, Greuber E, Vought K, Patel K, Kuritzky L. *Open-Label Adhesion Performance Studies of a New Lidocaine Topical System 1.8% versus Lidocaine Patches 5% and Lidocaine Medicated Plaster 5% in Healthy Subjects*. *J Pain Res*. 2021;14:513-526. Published

score of the generic lidocaine patches at the 12-hour interval was 37.67%.[17] This figure is based

on a scale where zero percent reflects complete detachment and 50% reflects half the product

lifting off the skin but not detached.[18]

33.     Although the study published by the Journal of Pain Research only tested generic

prescription lidocaine patches, upon information and belief, Defendant's OTC Lidocaine

Patches—which have not undergone the rigorous approval process required by the FDA and use

the same outdated and defective adhesion technology as the generic lidocaine patches—fair no

better.

34.     Furthermore, while certain companies have innovated their technology based on

clinical studies to ensure that their lidocaine patches are sufficiently flexible to adhere to a

consumer's body even while exercising,[19] upon information and belief, Defendant has not.

35.     In complete disregard of the wealth of information to the contrary, Defendant

continues to misrepresent that its Lidocaine Patches can provide pain relief to its consumers'

bodies for up to 12 hours when, in fact, they fail to do so by large margins given their poor

_____

2021 Feb 23. doi:10.2147/JPR.S287153.
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7914064/ (last accessed June 22, 2022).
[17] *Id.*
[18] *Id.*
[19] A separate study demonstrated that Scilex's lidocaine patches were able to reliably adhere
when subjects engaged in moderate physical exercise (e.g., bike exercise) and heat (heating pad).
*See* Fudin J, Wegrzyn EL, Greuber E, Vought K, Patel K, Nalamachu S. *A Randomized,
Crossover, Pharmacokinetic and Adhesion Performance Study of a Lidocaine Topical System
1.8% During Physical Activity and Heat Treatment in Healthy Subjects*. *J Pain Res*.
2020;13:1359-1367. Published 2020 Jun 10. doi:10.2147/JPR.S238268.
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7293912/#CIT0007 (last accessed June 22,
2022).

adhesion technology. This is crucial because "[a]dequate adhesion is a critical quality attribute for topical delivery systems; if the product lifts or detaches during wear, dosing may be compromised and there is an increased risk of inadvertent exposure to others."[20]

36.     Defendant also failed to inform its consumers that the Lidocaine Patches are prone to even greater detachment when they engage in moderate exercise or other regular daily activities (such as walking, stretching, and sleeping).

***Defendant's "Maximum Strength" Misrepresentations***

37.     In its Lidocaine Patches' packaging, Defendant misrepresents, without providing adequate disclaimers, that its Lidocaine Patches provide a "Maximum Strength" dose of lidocaine, when, in fact, there are superior prescription lidocaine patches in the market that deliver a higher amount of lidocaine: including the previously mentioned 5% and 1.8% prescription-strength lidocaine patches.[21] Dozens of prescription-strength lidocaine creams also contain a higher amount of lidocaine than Defendant's Lidocaine Creams.

38.     Defendant knew that by touting that its Lidocaine Products were "maximum strength" consumers would be misled into believing that the products are comparable to prescription-strength lidocaine products. Specifically, the FDA expressly cautioned

---

[20] *See* Gudin J, Argoff C, Fudin J, Greuber E, Vought K, Patel K, Nalamachu S. A Randomized, Open-Label, Bioequivalence Study of Lidocaine Topical System 1.8% and Lidocaine Patch 5% in Healthy Subjects. J Pain Res. 2020 Jun 22;13:1485-1496. doi: 10.2147/JPR.S237934. PMID: 32606914; PMCID: PMC7319520. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7319520/ (last accessed June 22, 2022).
[21] *Id.*

manufacturers of OTC analgesic products from making those claims in its amendment to the

1983 TFM in 1990 (the "1990 TFM Amendment"), because:

> It is possible that the same entity (a 0.5-percent hydrocortisone product), marketed by either the same manufacturer or different manufacturers, could appear on the store shelf side-by-side with different labeling: one stating that the product is **"regular strength"** and the other stating that the same strength product is **"maximum strength." <u>Further, referring to 1 percent hydrocortisone as "maximum strength" could not only be confusing but also be considered misleading because there are higher concentrations of hydrocortisone available by prescription.</u>** *See* External Analgesic Drug Products for Over-the-Counter Human Use; Amendment of Tentative Final Monograph, 55 Fed. Reg. 6932 (February 27, 1990).

39.     Defendant also knew that by labeling its Lidocaine Products as "maximum

strength" consumers would be misled into believing that they were comparable to prescription-

strength lidocaine products because, as discussed *supra*, Defendant capitalized on the aggressive

marketing of Salonpas which has compared its OTC products to prescription-strength products

for years. Defendant expressly compares its Lidocaine Products to Salonpas in the packaging of

its Lidocaine Products.

40.     Furthermore, Defendant's Lidocaine Patches do not contain, nor do they deliver, a

greater or even equal dose of lidocaine in comparison to other OTC lidocaine products.

41.     Shockingly, and by way of illustration, Defendant labels its Equate Pain Relieving

Patches as containing a "Maximum Strength"[22] dose of lidocaine although they possess

approximately 39% less lidocaine than the Salonpas lidocaine patches that they expressly

---

[22] Defendant's Equate Lidocaine Cool and Heat Patches do not contain the "Maximum Strength" representation and are not being challenged on that basis.

compare themselves to. Specifically, despite having the same measurement dimensions (i.e., 10 cm x 14 cm), Defendant's Equate Pain Relieving Patches only possess 344 milligrams of lidocaine[23][24] while the Salonpas lidocaine patches possess 560 milligrams.[25] Further, all of Defendant's Lidocaine Patches contain less lidocaine than other OTC lidocaine patches: which range from 411.4 to 4,500 milligrams.[26]

### Defendant's "Maximum Strength" Lidocaine Creams Misrepresentations

42.     Like its Lidocaine Patches, Defendant also misleads consumers into believing that its "Maximum Strength" Lidocaine Creams contain a greater dose of lidocaine than other OTC lidocaine creams, including those without a "maximum strength" label. Specifically, Defendant's Lidocaine Creams have a strength of 4% lidocaine,[27] yet dozens of comparable OTC lidocaine

[23] https://www.accessdata.fda.gov/spl/data/d91cc701-5e0b-d6c2-e053-2a95a90a9e75/d91cc701-5e0b-d6c2-e053-2a95a90a9e75.xml (last accessed June 22, 2022).
[24] Defendant also sells the same product with a different National Drug Code ("NDC") number: 49035-136-06. The FDA filing for this product is identical in all respects except its indication of lidocaine strength, which is displayed as lidocaine as 4 g/100g (i.e., 4%) and a mass of 9 g in 1 PATCH. Because Defendant uses a 4% lidocaine drug-to-patch mass ratio, and the mass of the at-issue patches is 9 grams, the maximum amount of lidocaine that could be contained in those patches is at most 360 milligrams. https://www.accessdata.fda.gov/spl/data/f15825a9-4e1a-46aa-b719-1c230ce05462/f15825a9-4e1a-46aa-b719-1c230ce05462.xml (last accessed June 22, 2022). Upon information and belief, the actual strength of these patches is also 344 milligrams based on the identical nature of their packaging and the fact that both products are available for sale on Defendant's website. *See* https://www.walmart.com/ip/Equate-Maximum-Strength-4-Lidocaine-Pain-Relieving-Patch-Odor-Free-6-Count/619096863 *and* https://www.walmart.com/ip/Equate-Maximum-Strength-Lidocaine-Pain-Relieving-Patches-6-Count/121592299?athbdg=L1200 (last accessed June 22, 2022).
[25] https://www.accessdata.fda.gov/spl/data/39b310ac-4be6-4b3d-85a7-7d30c99ba7d1/39b310ac-4be6-4b3d-85a7-7d30c99ba7d1.xml (last accessed June 22, 2022).
[26] See Attachment 1 re Citizen Petition from Scilex Pharmaceuticals Inc https://www.regulations.gov/document/FDA-2019-P-0417-0003 (last accessed June 22, 2022).
[27] https://www.accessdata.fda.gov/spl/data/b59d636b-70f5-45e0-846d-02a5676f2cb0/b59d636b-70f5-45e0-846d-02a5676f2cb0.xml; https://www.accessdata.fda.gov/spl/data/da5bf8cd-b5fa-

creams contain a strength of 5% lidocaine. Most of these stronger lidocaine creams are available online and in retail pharmacies.[28] Similarly, prescription-strength lidocaine creams contain more lidocaine than Defendant's Lidocaine Creams: some of which contain up to 7% lidocaine.

43.     Defendant's arbitrary and patently false claim regarding the strength of its Lidocaine Patches goes beyond the pale. Had Defendant not made the false, misleading, and deceptive misrepresentations and omissions alleged herein, Plaintiffs and the proposed Class Members would not have purchased the Lidocaine Products or would not have paid as much as they did for those purchases. Furthermore, Plaintiffs and the proposed Class Members paid a substantial premium for Defendant's Lidocaine Products because their price was inflated as a result of Defendant's false and misleading claims regarding their intrinsic qualities. Thus, Plaintiffs and the proposed Class Members suffered an injury in fact and lost money or property as a result of Defendant's wrongful conduct.

## CLASS ALLEGATIONS

44.     Plaintiffs bring this action on behalf of themselves and all other similarly situated persons pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), and (b)(3). Specifically, the Classes are defined as:

---

0278-e053-2995a90a7a8a/da5bf8cd-b5fa-0278-e053-2995a90a7a8a.xml (last accessed June 22, 2022).

[28] *See e.g.*, https://www.amazon.com/Ebanel-Lidocaine-Topical-Numbing-%20Menthol/dp/B08TJ3LMC3 (last accessed June 22, 2022).

**Nationwide Class:** All persons in the United States who, during the maximum period of time permitted by law, purchased Defendant's Lidocaine Products primarily for personal, family or household purposes, and not for resale.

**New York Subclass:** All persons residing in New York who, during the maximum period of time permitted by the law, purchased the Products primarily for personal, family or household purposes, and not for resale.

45.     The Classes do not include (1) Defendant, its officers, and/or its directors; or (2) the Judge to whom this case is assigned and the Judge's staff.

46.     Plaintiffs reserve the right to amend the above class definitions and add additional classes and subclasses as appropriate based on investigation, discovery, and the specific theories of liability.

47.     ***Community of Interest***: There is a well-defined community of interest among members of the Classes, and the disposition of the claims of these members of the Classes in a single action will provide substantial benefits to all parties and to the Court.

48.     ***Numerosity***: While the exact number of members of the Classes is unknown to Plaintiffs at this time and can only be determined by appropriate discovery, upon information and belief, members of the Classes number in the millions. The precise number of the members of the Classes and their identities are unknown to Plaintiffs at this time but may be determined through discovery. Members of the Classes may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

28

49.    *Commonality*: Common questions of law and fact exist as to all members of the Classes. These common legal and factual questions include, but are not limited to :

(a)    Whether the Lidocaine Products are defective;

(b)    Whether Defendant knew of the Lidocaine Products' defective nature;

(c)    Whether Defendant's representations that the Lidocaine Patches are "Stay-Put Flexible" patches that can be applied for 12 hours are false and misleading in violation of the Multi-State Consumer Protection Class consumer-protection statutes;

(d)    Whether Defendant's representation that the Lidocaine Products contain a "Maximum Strength" dose of lidocaine is false and misleading in violation of Multi-State Consumer Protection Class consumer-protection statutes;

(e)    Whether Defendant fraudulently induced the Nationwide Class into purchasing the Lidocaine Products;

(e)    Whether Plaintiffs and the members of the Classes have suffered damages as a result of Defendant's actions and the amount thereof;

(f)    Whether Plaintiff sand the members of the Classes are entitled to statutory damages;

(g)    Whether Plaintiffs and the members of the Classes are entitled to restitution;

(i)    Whether Plaintiffs and the members of the Classes are entitled to attorney's fees and costs?

50.    *Typicality:* The claims of the named Plaintiffs are typical of the claims of other members of the Classes in that the named Plaintiffs were exposed to Defendant's false and

misleading marketing, purchased Defendant's defective Lidocaine Products, and suffered a loss as a result of those purchases.

51.     *Adequacy*: Plaintiffs will fairly and adequately represent and protect the interests of the Classes as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiffs are adequate representatives of the Classes because they have no interests which are adverse to the interests of the members of the Classes. Plaintiffs are committed to the vigorous prosecution of this action and, to that end, Plaintiffs have retained skilled and experienced counsel.

52.     Moreover, the proposed Classes can be maintained because they satisfy both Rule 23(a) and 23(b)(3) because questions of law or fact common to Class Members predominate over any questions effecting only individual members and that a Class Action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

(a) The expense and burden of individual litigation makes it economically unfeasible for members of the Classes to seek to redress their claims other than through the procedure of a class action;

(b) If separate actions were brought by individual members of the Classes, the resulting duplicity of lawsuits would cause members of the Classes to seek to redress their claims other than through the procedure of a class action; and

(c) Absent a class action, Defendant likely will retain the benefits of its wrongdoing, and there would be a failure of justice.

## CAUSES OF ACTION

### COUNT I
### Quasi-Contract / Unjust Enrichment
### (On Behalf of Plaintiffs and the Nationwide Class)

53.     Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

54.     To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

55.     Plaintiffs and Nationwide Class Members conferred benefits on Defendant by purchasing the Lidocaine Products.

56.     Defendant was unjustly enriched in retaining the revenues derived from Plaintiffs and Nationwide Class Members' purchases of the Lidocaine Products.

57.     Retention of those moneys under these circumstances is unjust and inequitable because Defendant Lidocaine Products do not possess a "Maximum Strength"[29] dose of lidocaine and do not adhere to consumers' bodies as represented on the packaging of the Lidocaine Patches. These misrepresentations and omissions caused injuries to Plaintiffs and the Nationwide Class Members because they would not have purchased (or paid a premium for) the Lidocaine Products if the true facts were known.

---

[29] Defendant's Equate Lidocaine Cool and Heat Patches do not contain the "Maximum Strength" representation and are not being challenged on that basis.

58.     Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiffs the Nationwide Class Members is unjust and inequitable, Defendant has been unjustly enriched in an amount to be determined at trial.

## COUNT II
### Violation of the State Consumer Protection Statues[30]
### (On Behalf of Plaintiffs and the Nationwide Class)

59.     Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

60.     The Consumer Protection Statutes of the Nationwide Class prohibit the use of deceptive, unfair, and misleading business practices in the conduct of trade or commerce.

---

[30] While discovery may alter the following, Plaintiffs assert that the states with similar consumer fraud laws under the facts of this case include but are not limited to: Alaska Stat. § 45.50.471, et seq.; Ariz. Rev. Stat. §§ 44-1521, et seq.; Ark. Code § 4-88-101, et seq.; Cal. Bus. & Prof. Code § 17200, et seq.; Cal. Civ. Code §1750, et seq.; Colo. Rev. Stat. Ann. § 6-1-101, et seq.; Colo. Rev. Stat. Ann. § 6-1-101, et seq.; Conn. Gen Stat. Ann. § 42- 110, et seq.; 6 Del. Code § 2513, et seq.; D.C. Code § 28-3901, et seq.; Fla. Stat. Ann.§ 501.201, et seq.; Ga. Code Ann. § 10-1-390, et seq.; Haw. Rev. Stat. § 480-2, et seq.; Idaho Code. Ann. § 48-601, et seq.; 815 ILCS 501/1, et seq.; Ind. Code § 24-5-0.5-2, et seq.; Kan. Stat. Ann. § 50-623, et seq.; Ky. Rev. Stat. Ann. § 367.110, et seq.; LSA-R.S. 51:1401, et seq.; Me. Rev. Stat. Ann. Tit. 5, § 207, et seq.; Md. Code Ann. Com. Law, § 13-301, et seq.; Mass. Gen Laws Ann. Ch. 93A, et seq.;  Mich. Comp. Laws Ann. § 445.901, et seq.; Minn. Stat. § 325F, et seq.; Mo. Rev. Stat. § 407, et seq.; Neb. Rev. St. §§ 59-1601, et seq.; Nev. Rev. Stat. § 41.600, et seq.; N.H. Rev. Stat. § 358-A:1, et seq.; N.J. Stat. Ann. § 56:8, et seq.; N.M. Stat. Ann. § 57-12-1, et seq.; N.Y. Gen. Bus. Law § 349, et seq.; N.C. Gen Stat. § 75-1.1, et seq.; N.D. Cent. Code § 51-15, et seq.; Ohio Rev. Code Ann. § 1345.01, et seq.; Okla. Stat. tit. 15 § 751, et seq.; Or. Rev. Stat. § 646.605, et seq.; 73 P.S. § 201-1, et seq.; R.I. Gen. Laws § 6-13.1- 5.2(B), et seq.; S.C. Code Ann. §§ 39-5- 10, et seq.; S.D. Codified Laws § 37-24-1, et seq.; Tenn. Code Ann. § 47-18-101, et seq.; Tex. Code Ann., Bus. & Con. § 17.41, et seq.; Utah Code. Ann. § 13-11-175, et seq.; 9 V.S.A. § 2451, et seq.; Va. Code Ann. § 59.1-199, et seq.; Wash. Rev. Code § 19.86.010, et seq.; W. Va. Code § 46A, et seq.; Wis. Stat. § 100.18, et seq.; and Wyo. Stat. Ann. § 40-12-101, et seq.

61.     By the acts and conduct alleged herein, Defendant engaged in deceptive, unfair, and misleading acts and practices by representing on the packaging of its Lidocaine Products that they deliver a "Maximum Strength" [31] dose of lidocaine and that the Lidocaine Patches provide pain relief through a "Stay-Put Flexible Patch," that "Lasts Up to 12 Hours".

62.     Despite those representations, however, the Lidocaine Patches: (1) systematically fail to adhere to its consumers' bodies well before 12 hours; (2) are insufficiently flexible to withstand moderate exercise and other regular activities (such as walking, stretching, and sleeping); and (3) fail to continuously relieve pain throughout the specified amount of time represented therein due to their partial or complete detachment. Furthermore, none of the Lidocaine Products contain or deliver the maximum amount of lidocaine available in the market; and are not superior, or at least equivalent, in efficacy and results to other OTC and/or prescription-strength lidocaine products.

63.     The foregoing deceptive acts and practices were directed at consumers.

64.     The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the intrinsic qualities of the Lidocaine Products.

65.     As a result of Defendant's deceptive practices, Plaintiffs and the Nationwide Class Members suffered an economic injury because they would not have purchased (or paid a premium for) the Lidocaine Products had they known the veracity of Defendant's misrepresentations and omissions.

---

[31] Defendant's Equate Lidocaine Cool and Heat Patches do not contain the "Maximum Strength" representation and are not being challenged on that basis.

66.     On behalf of themselves and the Nationwide Class Members, Plaintiffs seek to recover their actual damages, statutory damages, punitive damages, and reasonable attorneys' fees and costs.

### COUNT III
**Violation of New York G.B.L. § 349**
**(On Behalf of Plaintiffs and the New York Subclass)**

67.     Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

68.     New York's General Business Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

69.     In its sale of Lidocaine Products throughout the State of New York, at all relevant times herein, Defendant conducted business and trade within the meaning and intendment of New York's General Business Law § 349.

70.     Plaintiffs and the New York Subclass Members are consumers who purchased the Lidocaine Products from Defendant for their personal use.

71.     By the acts and conduct alleged herein, Defendant engaged in deceptive, unfair, and misleading acts and practices by representing on the packaging of the Lidocaine Products that they deliver a "Maximum Strength" [32] dose of lidocaine and that the Lidocaine Patches provide pain relief through a "Stay-Put Flexible Patch," that "Lasts Up to 12 Hours".

---

[32] Defendant's Equate Lidocaine Cool and Heat Patches do not contain the "Maximum Strength" representation and are not being challenged on that basis.

72.      Despite those representations, however, the Lidocaine Patches: (1) systematically fail to adhere to its consumers' bodies well before 12 hours; (2) are insufficiently flexible to withstand moderate exercise and other regular activities (such as walking, stretching, and sleeping); and (3) fail to continuously relieve pain throughout the specified amount of time represented therein due to their partial or complete detachment. Furthermore, none of the Lidocaine Products contain or deliver the maximum amount of lidocaine available in the market; and are not superior, or at least equivalent, in efficacy and results to other OTC and/or prescription-strength lidocaine products.

73.      The foregoing deceptive acts and practices were directed at consumers.

74.      The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the intrinsic qualities of the Lidocaine Products.

75.      As a result of Defendant's deceptive practices, Plaintiffs and the New York Subclass Members suffered an economic injury because they would not have purchased (or paid a premium for) the Lidocaine Products had they known the veracity of Defendant's misrepresentations and omissions.

76.      On behalf of themselves and the New York Subclass Members, Plaintiffs seek to recover their actual damages or fifty dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees and costs.

**COUNT IV**
**Violation of New York G.B.L. §350**
**(On Behalf of Plaintiffs and the New York Subclass)**

77.     Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

78.     New York's General Business Law § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

79.     Defendant violated New York General Business Law § 350 by representing on the packaging of the Lidocaine Products that they deliver a "Maximum Strength" [33] dose of lidocaine and that the Lidocaine Patches provide pain relief through a "Stay-Put Flexible Patch," that "Lasts Up to 12 Hours".

80.      Despite those representations, however, the Lidocaine Patches: (1) systematically fail to adhere to its consumers' bodies well before 12 hours; (2) are insufficiently flexible to withstand moderate exercise and regular activities (such as walking, stretching, and sleeping); and (3) fail to continuously relieve pain throughout the specified amount of time represented therein due to their partial or complete detachment. Furthermore, none of the Lidocaine Products contain or deliver the maximum amount of lidocaine available in the market; and are not superior, or at least equivalent, in efficacy and results to other OTC and/or prescription-strength lidocaine products.

---

[33] Defendant's Equate Lidocaine Cool and Heat Patches do not contain the "Maximum Strength" representation and are not being challenged on that basis.

36

81.     The foregoing advertising was directed at consumers and was likely to mislead a reasonable consumer acting reasonably under the circumstances.

82.     Defendant's misrepresentations and omissions have resulted in consumer injury or harm to the public interest.

83.     As a result of Defendant's false advertising, Plaintiffs and the New York Subclass Members suffered an economic injury because they would not have purchased (or paid a premium for) the Lidocaine Products had they known the veracity of Defendant's misrepresentations and omissions.

84.     On behalf of themselves and the New York Subclass Members, Plaintiffs seek to recover their actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)     For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure; naming Plaintiffs as representative of the Classes; and naming Plaintiffs' attorneys as Class Counsel to represent the Classes;

(b)     For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(c)     For compensatory, statutory and punitive damages in amounts to be determined by the Court and/or jury;

(d)   For prejudgment interest on all amounts awarded;

(e)   For an order of restitution and all other forms of equitable monetary relief; and

(f)   For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable as of right.

Dated: July 8, 2022                                    Respectfully submitted,

                                                                **THE SULTZER LAW GROUP P.C.**

                                                                 By:   _/s/ Jason P. Sultzer__
                                                                        Jason P. Sultzer

                                                                Jason P. Sultzer, Esq.
                                                                Joseph Lipari, Esq.
                                                                Daniel Markowitz, Esq.
                                                                270 Madison Avenue, Suite 1800
                                                                New York, NY 10016
                                                                Telephone: (845) 483-7100
                                                                Facsimile: (888) 749-7747
                                                                E-Mail: sultzerj@thesultzerlawgroup.com
                                                                        liparij@thesultzerlawgroup.com
                                                                        markowitzd@thesultzerlawgroup.com

                                                                **GUCOVSCHI ROZENSHTEYN, PLLC**
                                                                Adrian Gucovschi, Esq.
                                                                630 Fifth Avenue, Suite 2000
                                                                New York, NY 10111
                                                                Telephone: (212) 884-4230
                                                                E-Mail: adrian@gr-firm.com

**BURSOR & FISHER, P.A**
Joseph I. Marchese, Esq.
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: jmarchese@bursor.com

*Attorneys for Plaintiffs*