**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Naomy Altagracia Gonzalez Rodriguez, Molla Brown, and Thomas Rodriguez, individually on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> Walmart Inc., <br><br> Defendant. | Case No.: 1:22-cv-02991-JPO |

**DEFENDANT WALMART INC.'S MEMORANDUM OF LAW IN SUPPORT OF**
**ITS MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Deborah H. Renner
John R. Vales
Sara Gates
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020
Tel.: (212) 768-6700
Fax: (212) 768-6800
deborah.renner@dentons.com
john.vales@dentons.com
sara.gates@dentons.com

*Attorneys for Defendant Walmart Inc.*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL BACKGROUND .......................................................................................................3

LEGAL STANDARD...................................................................................................................6

ARGUMENT ...............................................................................................................................7

I.       PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED A CONSUMER CLAIM ..............7

         A.       "Maximum Strength" Is Not Materially Misleading ................................................9

         B.       "Stay-Put Flexible Patch" Is Non-Actionable Puffery...........................................13

         C.       "Lasts Up to 12 Hours" Is Not Materially Misleading ..........................................15

         D.       Plaintiffs' Claims Regarding the Cream Products Should Be Dismissed..............17

         E.       Plaintiffs Have Not Alleged a Viable Omissions Claim.........................................19

         F.       Plaintiffs' Claims Under Other State Consumer Protection Statutes Also Fail.....21

II.      PLAINTIFFS' UNJUST ENRICHMENT CLAIM FAILS ...............................................22

CONCLUSION...........................................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ablaza v. Sanofi-Aventis U.S. LLC*,
Case No. 21-cv-01942-JST (July 12, 2022)....................................................21

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012).........................................................................20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................................................................................6, 7

*Axon v. Florida's Nat. Growers, Inc.*,
813 F. App'x 701 (2d Cir. 2020) ....................................................................8

*Becker v. Cephalon, Inc.*,
No. 14 CIV. 3864 NSR, 2015 WL 5472311 (S.D.N.Y. Sept. 15, 2015) ................10

*Brodsky v. Aldi Inc.*,
No. 20 C 7632, 2021 WL 4439304 (N.D. Ill. Sept. 28, 2021)................................16

*Brown v. Daikin Am. Inc.*,
756 F.3d 219 (2d Cir. 2014)............................................................................7

*Carrozza v. CVS Pharmacy, Inc.*,
391 F. Supp. 3d 136 (D. Mass. 2019) .............................................................10

*Chung v. Pure Fishing, Inc.*,
No. 20-CV-3983-RPK-CLP, 2022 WL 866769 (E.D.N.Y. Mar. 23, 2022) ............21

*Circle Click Media LLC v. Regus Mgmt. Grp. LLC*,
No. 12-04000 SC, 2013 WL 57861 (N.D. Cal. Jan. 3, 2013)................................15

*Corsello v. Verizon New York, Inc.*,
18 N.Y.3d 777 (2012) .................................................................................22

*Cosgrove v. Oregon Chai, Inc.*,
520 F. Supp. 3d 562 (S.D.N.Y. 2021).............................................................11

*Davis v. Hain Celestial Grp., Inc.*,
297 F. Supp. 3d 327 (E.D.N.Y. 2018) ............................................................11

*DiMuro v. Clinique Labs., LLC*,
572 F. App'x 27 (2d Cir. 2014) ....................................................................19

*Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*,
     400 F. App'x 611 (2d Cir. 2010) ...........................................................23

*Fink v. Time Warner Cable*
     714 F.3d 739 (2d Cir. 2013)................................................................8, 11, 16

*Fink v. Time Warner Cable*
     810 F. Supp. 2d 633 (S.D.N.Y. 2011)...................................................14

*Geffner v. Coca-Cola Co.*,
     928 F.3d 198 (2d Cir. 2019)................................................................8, 11

*George v. Starbucks Corp.*,
     No. 19-CV-6185 (AJN), 2020 WL 6802955 (S.D.N.Y. Nov. 19, 2020)....................14

*Georgia Malone & Co. v. Rieder*,
     19 N.Y.3d 511 (2012) ........................................................................22

*Gould v. Helen of Troy Ltd.*,
     No. 16 CIV. 2033 (GBD), 2017 WL 1319810 (S.D.N.Y. Mar. 30, 2017) .............21

*Green v. Covidien LP*,
     No. 18 CIV. 2939 (PGG), 2019 WL 4142480 (S.D.N.Y. Aug. 30, 2019) .............23

*Green v. SweetWorks Confections, LLC*,
     No. 18 CV 902-LTS-SN, 2019 WL 3958442 (S.D.N.Y. Aug. 21, 2019)...............12

*Harris v. Pfizer Inc.*,
     No. 21-CV-6789 (DLC), 2022 WL 488410 (S.D.N.Y. Feb. 16, 2022) ..................8

*Hart v. BHH, LLC*,
     No. 15CV4804, 2016 WL 2642228 (S.D.N.Y. May 5, 2016) ...........................7, 19

*Hrapoff v. Hisamitsu America, Inc.*,
     No. 21-1943, 2022 WL 2168076 (N.D. Cal. June 16, 2022)...........................21, 22

*Jessani v. Monini N. Am., Inc.*,
     744 F. App'x 18 (2d Cir. 2018) ..........................................................8, 11

*Kearns v. Ford Motor Co.*,
     567 F.3d 1120 (9th Cir. 2009) ...........................................................21

*Klestinez v. ACT Team*
     No. 6:21-CV-696-GLS-ATB, 2021 WL 4086128 (N.D.N.Y. Aug. 19, 2021)................20

*Lewis v. Casey*,
     518 U.S. 343 (1996)............................................................................1, 18

*In re Livent, Inc. Noteholders Sec. Litig.*,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001) ..................................................................7

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ..............................................................................................21

*Maurizio v. Goldsmith*,
    230 F.3d 518 (2d Cir. 2000) ..............................................................................7, 18

*Mazella v. Coca-Cola Co.*,
    No. 7-20-CV-05235-NSR, 2021 WL 2940926 (S.D.N.Y. July 12, 2021) ..............8

*Nelson v. MillerCoors, LLC*,
    246 F. Supp. 3d 666 (E.D.N.Y. 2017) ................................................................23

*Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank*,
    85 N.Y.2d 20 (1995) ............................................................................................20

*Pauwels v. Deloitte LLP*,
    No. 19-CV-2313 (RA), 2020 WL 818742 (S.D.N.Y. Feb. 19, 2020) ....................22

*Poindexter v. EMI Rec. Grp. Inc.*,
    No. 11 CIV. 559 LTS JLC, 2012 WL 1027639 (S.D.N.Y. Mar. 27, 2012) .............12

*Scilex Pharms., Inc. v. Sanofi-Aventis U.S. LLC*,
    No. 21-1280, 2021 WL 3417590 (N.D. Cal. Aug. 5, 2021) ..................................22

*Simington v. Lease Fin. Grp., LLC*,
    No. 10 CIV. 6052 KBF, 2012 WL 651130 (S.D.N.Y. Feb. 28, 2012) ....................21

*In re Sling Media Slingbox Advert. Litig.*,
    202 F. Supp. 3d 352 (S.D.N.Y. 2016) ..................................................................20

*Sorin v. Folger Coffee Co.*,
    No. 20-80897-CV, 2021 WL 5545292 (S.D. Fla. Mar. 5, 2021) ..........................16

*Stewart v. Riviana Foods Inc.*,
    No. 16-CV-6157 (NSR), 2017 WL 4045952 (S.D.N.Y. Sept. 11, 2017) ................3

*Turk v. Rubbermaid Inc.*,
    No. 21-CV-270 (KMK), 2022 WL 836894 (S.D.N.Y. Mar. 21, 2022) ..................16

*Warth v. Seldin*,
    422 U.S. 490 (1975) ............................................................................................18

*Woodhams v. Pfizer, Inc.*,
    No. 18-CV-3990 (JPO), 2021 WL 5304309 (S.D.N.Y. Nov. 15, 2021) ................22

*Young v. L'Oreal, Inc.*,
No. 21-CV-0446-GHW-KHP, 2021 WL 2295625 (S.D.N.Y. May 20, 2021) .......................21

*Zachmann v. Coleman Co. Inc.*,
No. 20 CV 9146 (VB), 2022 WL 161480 (S.D.N.Y. Jan. 18, 2022).......................................14

*Zottola v. Eisai Inc.*,
564 F. Supp. 3d 302 (S.D.N.Y. 2021).................................................................................10

**Statutes and Rules**

Fed. R. Civ. P. 8...........................................................................................................................20

Fed. R. Civ. P. 9(b) .....................................................................................................................21

Fed. R. Civ. P. 12(b)(1).........................................................................................................*passim*

Fed. R. Civ. P. 12(b)(6).........................................................................................................*passim*

N.Y. Gen. Bus. Law § 349....................................................................................................1, 6, 7

N.Y. Gen. Bus. Law § 350....................................................................................................1, 6, 7

**Other Authorities**

*Equate Lidocaine + Menthol Pain Relief Patch*, Walmart.com,
https://www.walmart.com/ip/Equate-Lidocaine-and-Menthol-Pain-Relief-
Patch-5-Count/529149652 (last visited July 28, 2022)...........................................................3

*Equate Maximum Strength Lidocaine Pain Relieving Patch*, Walmart.com,
https://www.walmart.com/ip/Equate-Maximum-Strength-Lidocaine-Pain-
Relieving-Patches-6-Count/121592299 (last visited July 28, 2022) ........................................3

*Equate Pain Relief Cream (Roll On)*, Walmart.com,
https://www.walmart.com/ip/Equate-Max-Strength-Lidocaine-Pain-Relief-
Cream-2-5-fl-oz/253155134 (last visited July 28, 2022)...........................................................3

*Equate Pain Relieving Cream*, Walmart.com,
https://www.walmart.com/ip/Equate-Max-Strength-Lidocaine-Pain-Relieving-
Cream-2-7-oz/692263008 (last visited July 28, 2022) ..............................................................3

*External Analgesic Drug Products for Over-the-Counter Human Use*; Tentative
Final Monograph, 48 Fed. Reg. 5852-01, 5867 (Feb. 8, 1983) .............................................2, 9

*National Drug Code Directory*, FDA.gov, https://www.fda.gov/drugs/drug-approvals-
and-databases/national-drug-code-directory (last visited July 28, 2022) ...............................12

*Salonpas Maximum Strength Pain Relieving Gel-Patch, 6 ct*, Walmart.com,
   https://www.walmart.com/ip/Salonpas-Maximum-Strength-Pain-Relieving-
   Gel-Patch-6-ct/54902233 (last visited July 28, 2022) ............................................................11

*Temporary*, Merriam Webster, https://www.merriam-webster.com/dictionary/temporary
   (last visited July 28, 2022) ....................................................................................................17

*Up To*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/
   english/up-to (last visited July 28, 2022).........................................................................15–16

*Up To*, Merriam-Webster, https://www.merriam-webster.com/dictionary/up%20to
   (last visited July 28, 2022) ....................................................................................................15

*Walmart.com Terms of Use*, Walmart.com, https://www.walmart.com/
   help/article/walmart-com-terms-of-use/3b75080af40340d6bbd596f116fae5a0
   (last visited July 28, 2022) ....................................................................................................14

Defendant Walmart Inc. ("Defendant" or "Walmart") respectfully submits this memorandum of law in support of its motion to dismiss the first amended complaint ("Amended Complaint" or "AC") brought by plaintiffs Naomy Altagracia Gonzalez Rodriguez ("Gonzalez Rodriguez"), Molla Brown ("Brown") and Thomas Rodriguez ("Rodriguez," and collectively, "Plaintiffs"), pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

## PRELIMINARY STATEMENT

Plaintiffs' lawsuit is one of several class actions filed in recent months alleging the misleading labeling of adhesive lidocaine patches and creams sold over the counter at retail stores like Walmart. In their Amended Complaint, the named Plaintiffs assert claims for: unjust enrichment (Count I); violation of consumer protection statutes in all jurisdictions nationwide (Count II); and violation of Sections 349 and 350 of New York General Business Law ("GBL") (Counts III and IV, respectively). Despite amending their pleading, Plaintiffs fail to plausibly allege that Walmart has been unjustly enriched or violated the GBL or any other consumer protection statute.

The Amended Complaint takes a blunderbuss approach, glomming together allegations about different products. Indeed, while the named Plaintiffs allege misleading statements about four products—two patches and two creams—they only allege purchasing and using three of those products. The named Plaintiffs lack standing under Fed. R. Civ. P. 12(b)(1) to bring claims for products they did not purchase and from which they do not allege injury. Similarly, the named Plaintiffs lack standing to bring consumer fraud claims under the laws of other jurisdictions on behalf of absent class members where they themselves do not allege injury in those jurisdictions. It is elemental that a named plaintiff cannot assert the claim of absent class members to create standing where it otherwise would not exist. *See, e.g., Lewis v. Casey*, 518 U.S. 343, 357 (1996).

1

The remainder of Plaintiffs' claims fail under Fed. R. Civ. P. 12(b)(6). Plaintiffs claim that the products misleadingly state that they are "Maximum Strength," "Stay-Put Flexible Patches" that will last "Up to 12 Hours." But only the patches have all of these representations. Even if their pleading had been more meticulous, Plaintiffs' claims would still be lacking because none of these statements is misleading, and Plaintiffs fail to plausibly allege otherwise under Fed. R. Civ. P 12(b)(6):

*First*, the products at issue are indeed the "Maximum Strength" permitted by the U.S. Food and Drug Administration for over-the-counter products. *See External Analgesic Drug Products for Over-the-Counter Human Use*; Tentative Final Monograph, 48 Fed. Reg. 5852-01, 5867 (Feb. 8, 1983). Plaintiffs attempt to paint "Maximum Strength" as misleading by making an apples-to-oranges comparison to *prescription* medications. But no reasonable consumer would believe that they could obtain a higher strength lidocaine product off the shelf than through a prescription. Plaintiffs also rely on their own mathematical calculations to come up with an allegation that the Patch Products are not "maximum strength." But their math is just wrong, and surely, a viable class action complaint should be built on more than back-of-the-envelope math.

*Second*, the phrase "Stay-put Flexible Patch" cannot provide a basis for a claim under the GBL or any other consumer fraud statute because it presents no metric for measurement and is thus considered non-actionable "puffery."

*Third*, the phrase "Lasts Up to 12 Hours" offers no guarantee for how long the adhesive patches will adhere, but only a ceiling—through the use of qualifier "up to"—for use of a single patch. No reasonable consumer would read this language as a guarantee of 12 hours of adhesion.

Indeed, unable to allege any actionable *misrepresentations*, Plaintiffs appear to claim that there are actionable *omissions* on the labels. But they fail to identify any material information

omitted from the labels.  Plaintiffs' fallback position appears to be their unjust enrichment claim. But this claim fails, among other reasons, for all the same reasons the GBL claims fail.  No reasonable consumer could have been misled by any of the labeling described in the Amended Complaint.

Plaintiffs' allegations are entirely without merit and Plaintiffs should not be permitted to amend again.  The Amended Complaint should be dismissed with prejudice.

## FACTUAL BACKGROUND

This action concerns two adhesive patch products (the "Patch Products") and two cream products (the "Cream Products," and together with the "Patch Products," the "Products") containing lidocaine, a topical anesthetic that is used to treat pain:

(1)     Equate Maximum Strength Lidocaine Pain Relieving Patch, NDC 49035-136-06, https://www.walmart.com/ip/Equate-Maximum-Strength-Lidocaine-Pain-Relieving-Patches-6-Count/121592299 (the "MS Patch");

(2)     Equate Lidocaine + Menthol Pain Relief Patch, NDC 79903-038-05, Walmart.com, https://www.walmart.com/ip/Equate-Lidocaine-and-Menthol-Pain-Relief-Patch-5-Count/529149652 (the "Menthol Patch");

(3)     Equate Pain Relieving Cream, NDC 49035-860-01, https://www.walmart.com/ip/Equate-Max-Strength-Lidocaine-Pain-Relieving-Cream-2-7-oz/692263008 (the "Cream"); and

(4)     Equate Pain Relief Cream (Roll On), NDC 49035-634-97, https://www.walmart.com/ip/Equate-Max-Strength-Lidocaine-Pain-Relief-Cream-2-5-fl-oz/253155134 (the "Cream Roll-on").

*See* AC ¶¶ 1–3.  Each of the Products, as pictured in the Amended Complaint and on Walmart's website,[1] are available for purchase by the general public over the counter ("OTC"), meaning without restriction, in Walmart's retail stores.  *See id.* ¶¶ 1, 13.

---

[1] The Court may take judicial notice of the full product packaging, as shown on Defendant's website, as Plaintiffs rely on the labels throughout their Amended Complaint and the authenticity of the product packaging is not in dispute.  *See Stewart v. Riviana Foods Inc.*, No. 16-CV-6157 (NSR), 2017 WL 4045952, at *6 (S.D.N.Y. Sept. 11, 2017).

All four of the Products prominently disclose on the front labels that they contain 4% lidocaine, and direct consumers to compare this concentration of lidocaine to the active ingredient in other OTC lidocaine patch and cream products, including Salonpas, Icy Hot, and Aspercreme. *See id.* ¶ 3.  On the front and back labels of the Products, the labels indicate that the Products are intended to be used for "temporary" pain relief or to "temporarily" relieve minor pain.  *See id.*; *supra* n.1.  For the Patch Products, the "Directions" instruct users to "Apply sticky side of patch to affected area. Use one patch for up to 12 hours."  *Id.*

Although Plaintiffs identify the four Products in their Amended Complaint, they only allege that they purchased three of the four Products—not the Cream Roll-on.  AC ¶¶ 10–13.  Plaintiffs allege that the labels for all of the Products are false and misleading, focusing on the following three statements: (1) "Maximum Strength," (2) "Stay-put, flexible patch," and (3) "Lasts Up to 12 Hours."  *Id.*  But these statements only appear on some of the products: "Maximum Strength" only appears on two labels—the MS Patch and the Cream Roll-on (which Plaintiffs did not even purchase).  The terms "Stay-put, flexible patch," and "Lasts Up to 12 Hours" only appear on the Patch Products.  *Id.* ¶ 3.  Plaintiffs do not allege that the Cream contains any of these misrepresentations.[2]  *See id.*

Plaintiffs allege that they believed that the Patch Products "provide[d] pain relief, that is 'maximum strength,' through a 'stay-put flexible patch,' that 'lasts up to 12 hours.'"  *Id.* ¶¶ 10–13.  Oddly, Plaintiffs also allege that they believed "Maximum Strength" to mean that the Products "contained and delivered the maximum amount of lidocaine available in patch form *with or without a prescription*."  *Id.* ¶¶ 10–12 (emphasis added).

Plaintiffs' claim that "Maximum Strength" is false and deceptive hinges on two reasons:

---

[2] "Max Strength" appears on the Cream, but Plaintiffs make no allegations about this statement.

(1) "there are superior *prescription* lidocaine patches in the market that deliver a higher amount of lidocaine," specifically 5% prescription-strength lidocaine patches, and (2) the MS Patch does not contain or deliver "a greater or even equal dose of lidocaine in comparison to other OTC lidocaine products." *Id.* ¶¶ 37–38 (emphasis added).  The first theory is of course nonsense—why any reasonable consumer would believe that an OTC product could be as powerful as a prescription product strains credulity.  For the latter theory, Plaintiffs attempt to calculate the amount of milligrams of lidocaine in the MS Patch.  But their math is wrong.  They misconstrue information and bare figures submitted to the National Drug Code ("NDC") database.  *Id.* ¶ 41 & nn.23–27. For example, Plaintiffs rely on information submitted for another product that is not at issue in this action, and also construe a figure provided as "9 g" as mass when it is more reasonably understood as weight.  *See id.* ¶ 41 nn.23–24.  As a result, Plaintiffs allege that the Patch Products do not "contain or deliver the maximum amount of lidocaine available in the market; and are not superior, or at least equivalent, in efficacy and results to other OTC and/or prescription-strength lidocaine products."  *Id.* ¶ 28, 37.

Similarly, for "Stay-put flexible patch" and "Lasts Up to 12 Hours," Plaintiffs' claim that these statements are false and deceptive is based on Plaintiffs' general allegations that: (1) the Patch Products "were not sufficiently 'flexible' to withstand regular daily activities;" and (2) they "systematically peel off consumers' bodies within a short time after being properly applied—thus depriving consumers of the advertised benefits."  *Id.* ¶¶ 4, 10–12.  However, Plaintiffs do not point to any statement on the product packaging that refers to "regular daily activities," which Plaintiffs characterize as "walking, stretching, and sleeping."  *Id.* ¶¶ 26–27.  Nor do Plaintiffs explain how they used the Patch Products or exactly how long it was before they peeled off, only alleging the canned response that they peeled off "well before the represented 12 hours."  *Id.* ¶¶ 10–12.

For their adhesiveness claims, Plaintiffs cite to a handful of unverified and questionable sources, including: (1) product reviews on Walmart.com; (2) a class action website regarding this very lawsuit; (3) what Plaintiffs characterize as a U.S. Food and Drug Administration ("FDA") "report" on transdermal drug delivery systems, which is actually a personal presentation that does not represent the views of the FDA;[3] (4) consumer reports to the FDA regarding *prescription* lidocaine patches; and (5) a study on *prescription* lidocaine patches. *See id.* ¶¶ 29–32.

In the Amended Complaint, Plaintiffs seek monetary relief on behalf of persons who purchased the Products "primarily for personal, family or household purposes" through a nationwide class and a New York sub-class. *Id.* ¶ 44. Plaintiffs' claims sound in (1) unjust enrichment, (2) violation of state consumer protection statutes of all 50 states, (3) violation of N.Y. Gen. Bus. Law § 349 for deceptive practices, and (4) violation of N.Y. Gen. Bus. Law § 350 for false advertising. *Id.* ¶¶ 53–84.

Defendant previously moved to dismiss Plaintiff Gonzalez Rodriguez's complaint. *See* Dkt. No. 13. In response, Plaintiffs amended the complaint. But the Amended Complaint remains deficient and should be dismissed.

## **LEGAL STANDARD**

It is well-settled that to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

---

[3] Plaintiffs cite to a link, but that link is to a personal presentation from an FDA employee, which states on the first slide of the presentation the following disclaimer: "Views expressed in this presentation are mine, and have not been adopted as regulatory policies by the Food and Drug Administration at this time." *See id.* ¶ 31 n.14.

alleged." *Id.*  But "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, and "[courts] 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 225 (2d Cir. 2014) (citations omitted).  While the Court is generally required to accept a complaint's factual allegations as true, the Court need not "accept as truth conflicting pleadings that make no sense . . . or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405–06 (S.D.N.Y. 2001) (collecting cases).

"The standards of review for a motion to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction and under Fed. R. Civ. P. 12(b)(6) for failure to state a claim are substantively identical except that on a motion to dismiss under Fed. R. Civ. P. 12(b)(1), the party invoking the Court's jurisdiction bears the burden of demonstrating that subject matter jurisdiction exists. . . ." *Hart v. BHH, LLC*, No. 15CV4804, 2016 WL 2642228, at *2 n.3 (S.D.N.Y. May 5, 2016) (internal citation omitted).

## ARGUMENT

## I.      PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED A CONSUMER CLAIM

New York's General Business Law prohibits the use of "[d]eceptive acts or practices" and "[f]alse advertising" "in the conduct of any business, trade or commerce."  N.Y. Gen. Bus. Law §§ 349, 350.  "To make out a prima facie case under Section 349, a plaintiff must demonstrate that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000).  Courts consider the same elements for advertising under Section 350 claims. *See id.* at 522.

To survive a motion to dismiss a Section 349 or 350 claim, Plaintiffs must do more than

allege that a product "label might conceivably be misunderstood by some few consumers." *Jessani v. Monini N. Am., Inc.*, 744 F. App'x 18, 19 (2d Cir. 2018) (internal quotation marks and citation omitted).  Plaintiff must plausibly allege "that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled by the relevant statements." *Axon v. Florida's Nat. Growers, Inc.*, 813 F. App'x 701, 704 (2d Cir. 2020) (internal quotation marks and citation omitted).  Where the allegations in the complaint are materially inconsistent with the evidence the plaintiffs rely upon, such as the product labels, the Court may "easily conclude that Plaintiffs' claims lack the facial plausibility necessary to survive a motion to dismiss." *Fink v. Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2013); *accord Axon*, 813 F. App'x at 704.  "It is well settled that a court may determine as a matter of law that an allegedly deceptive advertisement would not have misled a reasonable consumer." *Fink*, 714 F.3d at 741.

Context is crucial in determining whether a reasonable consumer would have been misled by a particular statement.  *See Fink*, 714 F.3d at 742.  The Court must view each allegedly misleading statement in the context of the product as a whole, taking into account the information available to consumers, including the context of the commercial transaction.  *See Geffner v. Coca-Cola Co.*, 928 F.3d 198, 200 (2d Cir. 2019); *Jessani*, 744 F. App'x at 19; *Mazella v. Coca-Cola Co.*, No. 7-20-CV-05235-NSR, 2021 WL 2940926, at *3 (S.D.N.Y. July 12, 2021).  "A plaintiff does not have a claim under the GBL just because she comes away from an advertisement with an incorrect impression."  *Harris v. Pfizer Inc.*, No. 21-CV-6789 (DLC), 2022 WL 488410, at *7 (S.D.N.Y. Feb. 16, 2022).

As detailed below, Plaintiffs' claims fail under Fed. R. Civ. P. 12(b)(6) because "Maximum Strength" and "Lasts Up to 12 Hours" are not materially misleading, and "Stay-put flexible patch" constitutes non-actionable puffery.  Their unjust enrichment claim fails for similar reasons.

Moreover, Plaintiffs lack standing under Fed. R. Civ. P. 12(b)(1) to bring a claim on the Cream, which none of them is alleged to have purchased. Similarly, the named Plaintiffs cannot bring consumer fraud claims under the laws of multiple jurisdictions to which they have no connection simply by styling their case as a class action.

### A.   "Maximum Strength" Is Not Materially Misleading

The use of the words "Maximum Strength" on the MS Patch would not mislead a reasonable consumer because the statement is accurate for an OTC product.  As the MS Patch indicates directly below the "Maximum Strength" statement, the product contains "Lidocaine 4%," AC ¶ 3, which is the *maximum concentration* permitted in such OTC products.  *See* 48 Fed. Reg. at 5867.[4]  Plaintiffs, nonetheless, claim that "Maximum Strength" is misleading because the product does not "contain or deliver the maximum amount of lidocaine available in the market" and is "not superior, or at least equivalent, in efficacy and results to other OTC and/or prescription-strength lidocaine products."  AC ¶¶ 25, 28.

Plaintiffs' theories fail for several reasons:

*First*, Plaintiffs' allegation that consumers would read "Maximum Strength" to mean maximum amount available in the market is unreasonable.  While Plaintiffs do not define "the market," they sweep in prescription medications that contain a higher concentration of lidocaine, which can only be obtained through a doctor or at a hospital.  *See* AC ¶ 37.  But in construing "Maximum Strength" in this way, Plaintiffs improperly read the label devoid of its *context*, including the context of the retail transaction.  A reasonable consumer picking an OTC pain relief

---

[4] Plaintiffs seem to rely on draft proposed 2003 FDA rule to bolster their allegation that it is difficult to discern what a maximum dose would be for a Patch Product.  *See* AC ¶ 20.  However, to date, the FDA has not published any final rules (which would be contained in a "final monograph") for external analgesic OTC drug products.

product off the shelf at a Walmart store would not compare the product to medications that are not readily available to them or think that "Maximum Strength" on the label of an OTC product indicates that the product is stronger than what they could obtain through a prescription or at a hospital.  It is widely known and understood that "prescription drugs are not available in the same manner as usual consumer products."  *Becker v. Cephalon, Inc.*, No. 14 CIV. 3864 NSR, 2015 WL 5472311, at *8 (S.D.N.Y. Sept. 15, 2015) (internal citation omitted).  Consumers understand the difference between OTC and prescription drugs the same way they understand the difference between a doctor-patient relationship and a retailer-consumer transaction.  Whether a patient is treated with a prescription medication at a hospital or obtains it from a pharmacist, they understand that a prescription product is provided as a medical treatment by a doctor.  *Cf. Zottola v. Eisai Inc.*, 564 F. Supp. 3d 302, 315 (S.D.N.Y. 2021) (dismissing breach of implied warranty claim against CVS, finding that "there is no basis for adopting the view that a pharmacist is a retail merchant" because a "pharmacist's sales of prescription drugs are not attributable to his or her marketing the properties of the drugs[;] [t]hey are attributable to physicians' prescriptions"); *Carrozza v. CVS Pharmacy, Inc.*, 391 F. Supp. 3d 136, 148 (D. Mass. 2019), *aff'd*, 992 F.3d 44 (1st Cir. 2021) (finding that the UCC did not apply to the filling of a prescription by a pharmacist because a "pharmacist who fills a prescription is in a different position from the ordinary retailer because . . . he is providing a service to the doctor and acting as an extension of the doctor in the same sense as a technician who takes an X-ray or analyzes a blood sample on a doctor's order").  A patient obtaining a prescription for medical use is vastly different from a retail shopper purchasing an OTC product for personal use, as Plaintiffs did here.  *See* AC ¶¶ 10–12.

   Plaintiffs' strained interpretation for purposes of their claims is also unsupported by the label, which indicates the strength of the active ingredient—4% lidocaine—on the front label

directly below "Maximum Strength." *Id.* ¶ 3. The label does not indicate that the product offers a stronger dose than a prescription drug, but instead offers a specific comparison to the concentration of the active ingredient in another OTC product, which also contains 4% lidocaine. *See id.*[5] Any reasonable consumer encountering the MS Patch in a Walmart store will clearly see the amount of lidocaine that the product contains and can compare it to other products on the shelf, that are available to the general public OTC. The context of the purchase, and how OTC drug products are marketed and sold, cannot be ignored. *See, e.g.*, *Geffner*, 928 F.3d at 200 (considering the word, alleged to be misleading, in the context of the marketing for that type of product); *Fink*, 714 F.3d at 742 (stating that "context is crucial"); *Jessani*, 744 F. App'x at 19 (considering how a product is produced and priced to determine whether a statement on a product label would mislead reasonable consumers); *Davis v. Hain Celestial Grp., Inc.*, 297 F. Supp. 3d 327, 335 (E.D.N.Y. 2018) (finding that the context of the purchase—from a local store, not a specialty stand-alone store—cut against the plaintiff's section 349 and 350 claims). Plaintiffs' unreasonable apples-to-oranges comparison to prescription products simply does not pass the plausibility test to support their consumer claims.

*Second*, Plaintiffs rely on a tentative final monograph issued by the FDA regarding an entirely different drug product—hydrocortisone—to support their theory. *See* AC ¶ 38. That monograph is irrelevant as it relates to a different product and says nothing about how reasonable

---

[5] Plaintiffs state in the Amended Complaint that Salonpas provides OTC lidocaine products. *See* AC ¶ 16. As Plaintiffs point out and rely upon the Salonpas product in their Amended Complaint, *see, e.g.*, *id.* ¶ 25, the Court may take judicial notice of the fact that the Salonpas product indicates that it contains 4% lidocaine. *See Salonpas Maximum Strength Pain Relieving Gel-Patch, 6 ct*, Walmart.com, https://www.walmart.com/ip/Salonpas-Maximum-Strength-Pain-Relieving-Gel-Patch-6-ct/54902233 (last visited July 28, 2022). *See Cosgrove v. Oregon Chai, Inc.*, 520 F. Supp. 3d 562, 581 (S.D.N.Y. 2021) ("[A] court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and it is capable of accurate and ready determination." (internal citation omitted)).

consumers read and understand a product label while shopping in their local Walmart. Moreover, the "reasonable consumer" test takes into account the information available to consumers, and Plaintiffs do not—and cannot—allege that consumers have reviewed a tentative non-final monograph from 1990 regarding an entirely different drug. *See Green v. SweetWorks Confections, LLC*, No. 18 CV 902-LTS-SN, 2019 WL 3958442, at *6 (S.D.N.Y. Aug. 21, 2019). Similarly, Plaintiffs baldly allege that Defendant benefited from Salonpas's "aggressive marketing" in 2016 in which it purportedly compared its OTC products to prescription products. AC ¶¶ 16–17, 39. But Plaintiffs do not allege that consumers shopping for Defendant's "Maximum Strength" Products reviewed or were even aware of Salonpas's marketing, particularly marketing from six years ago. *See id.* ¶ 39. These allegations are irrelevant to the reasonable consumer inquiry.

*Third*, Plaintiffs' claim that "Maximum Strength" on the MS Patch is misleading because the Product does not contain a greater or equal dose of lidocaine in comparison to other OTC lidocaine products is a red herring. *See id.* ¶ 40. To prop up this allegation, Plaintiffs rely on dubious data, gleaned from a self-submission database,[6] that is not present on the Product label. *See id.* ¶ 41 & nn.21–26. A self-submission database is inherently unreliable. Moreover, the information in the database is contrary to Plaintiffs' allegations, and accordingly, the allegations need not be accepted as true. *See Poindexter v. EMI Rec. Grp. Inc.*, No. 11 CIV. 559 LTS JLC, 2012 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2012) ("If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true."). Indeed, the web page for the MS Patch in the database indicates that the product strength is "4 g in 100 g" lidocaine, or 4% lidocaine, as

---

[6] *National Drug Code Directory*, FDA.gov, https://www.fda.gov/drugs/drug-approvals-and-databases/national-drug-code-directory (last visited July 28, 2022) (noting that the information is submitted by labelers).

the front label of the MS Patch states.  *See id.* ¶¶ 3, 41 n.24.  Plaintiffs ignore this information and, in a sleight of hand, they purport to calculate the amount of milligrams of lidocaine in the MS Patch using other information available from the database, which simply states "9 g in 1 PATCH." *See id.* 41 n.24 (citing https://www.accessdata.fda.gov/spl/data/f15825a9-4e1a-46aa-b719-1c230ce05462/f15825a9-4e1a-46aa-b719-1c230ce05462.xml).  Plaintiffs erroneously conclude that "g" refers to the *mass* of the patch, but this is simply unsupported by the information available, which does not indicate whether "9 g" refers to mass or weight.  *See id.*  Plaintiffs' suspect calculations, based on incomplete data, cannot support their theory.

Plaintiffs also allege that Defendant's "Maximum Strength" MS Patch possesses 344 milligrams of lidocaine, whereas the Salonpas' product possesses 560 milligrams of lidocaine to insinuate that the "maximum strength" label is inaccurate.  AC ¶ 41.  But this allegation is made on information and belief.  *See id.* ¶ 41 n.24.  And, for the 344 milligrams, Plaintiffs cite product information for a different Equate product: NDC 79903-106-06.  *See id.* ¶ 41 n.23.  But this is not the same product that Plaintiffs identify in their Amended Complaint.  *See id.* ¶ 3 (showing the image of the product bearing NDC 49035-136-06).  As Plaintiffs acknowledge, the two products, which have different NDCs are sold separately, and each have separate listings on Walmart's website.[7]  *See id.* ¶ 41 n.24.  Accordingly, this allegation, too, is fallacious.

**B.   "Stay-Put Flexible Patch" Is Non-Actionable Puffery**

One of the statements that Plaintiffs identify in their Amended Complaint, "Stay-put flexible patch," which only appears on the MS Patch and Menthol Patch, cannot provide the basis

---

[7] Plaintiffs' citation to the milligrams of lidocaine in other patch products, derived from a citizen petition submitted to the FDA, also does not support their theory.  Defendant's Patch Products are not listed in the document cited.  And Plaintiffs' comparison is again based on erroneous math. *See* AC ¶ 41 & n.26.

for a consumer claim because it is mere puffery. It is well-settled that subjective claims about products that cannot be proven either true or false, are known as "puffery," and they are not actionable under the GBL. *George v. Starbucks Corp.*, No. 19-CV-6185 (AJN), 2020 WL 6802955, at *2 (S.D.N.Y. Nov. 19, 2020) (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 159 (2d Cir. 2007)), *aff'd*, 857 F. App'x 705 (2d Cir. 2021). Such vague language is not likely to mislead reasonable consumers because consumers would understand the statements to be an expression of the seller's opinion. *Id.* "Courts have found statements to be puffery as a matter of law when the statements do not provide any concrete representations." *Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 644 (S.D.N.Y. 2011).

Here, the use of "Stay-put flexible patch" in a bullet point list on the front label of the Patch Products is not actionable because it is too subjective and vague. Plaintiffs allege that they believed that the Patch Products "were sufficiently flexible to withstand regular activities for a person suffering from sore muscles (such as walking, stretching, and sleeping)." AC ¶¶ 10–12, 26.[8] But the labels simply do not state that. *See id.* ¶ 3. Nor do the labels state that the adhesive patches will "stay put" for "12 hours," as Plaintiffs imagine. *See id.* Rather, "Stay-put flexible patch" appears alongside statements like "Easy to apply" and "No-mess," which can only be

_____

[8] In a footnote in the Amended Complaint, Plaintiffs cite other representations from Walmart's website, characterizing them as "additional elaboration," (AC ¶ 26 n.9), but Plaintiffs do not allege that they saw any of these representations before purchasing the Patch Products. *See id.* ¶¶ 10–12. These additional statements are therefore not relevant to Plaintiffs' claims. *See Zachmann v. Coleman Co. Inc.*, No. 20 CV 9146 (VB), 2022 WL 161480, at *4 (S.D.N.Y. Jan. 18, 2022) (finding that where plaintiffs cited allegedly misleading statements but did not allege that they saw the statements before they purchased the products, the court could not infer causation from plaintiffs' conclusory allegations of reliance). Additionally, statements made on Walmart.com are covered by the Walmart.com Terms of Use, which include a mandatory arbitration provision and class action waiver. *See Walmart.com Terms of Use*, Walmart.com, https://www.walmart.com/help/article/walmart-com-terms-of-use/3b75080af40340d6bbd596f116fae5a0 (last visited July 28, 2022).

understood as general and vague descriptions of the Patch Products.  *Cf. Circle Click Media LLC v. Regus Mgmt. Grp. LLC*, No. 12-04000 SC, 2013 WL 57861, at *10 (N.D. Cal. Jan. 3, 2013) (dismissing consumer claims, finding that "[s]imple, easy and flexible" amounted to non-actionable puffery since it is vague and highly subjective).

Because the Patch Products do not specify how long an adhesive patch will "stay-put" or indicate how flexible it is, "Stay-put flexible patch" statement is simply not capable of measurement or being proven true or false.  Plaintiffs' attempt to read "Stay-put" into the "use of up to 12 hours" direction ignores the context of how these statements appears on the product packaging.  Without any metric for measurement, Plaintiffs have not plausibly alleged that "Stay-put flexible patch" is false or misleading.

### C.      "Lasts Up to 12 Hours" Is Not Materially Misleading

The use of "Lasts Up to 12 Hours," including the label's direction to use one patch for "up to 12 hours," on the Patch Products also does not support Plaintiffs' consumer claims.  Plaintiffs allege that the statement is misleading because the Patch Products "systematically fail to adhere to its consumers' bodies for 12 hours" and "fail to continuously relieve pain throughout the specified amount of time represented therein due to their partial or complete detachment."  AC ¶¶ 26–27.

But Plaintiffs' interpretation of "up to 12 hours" as a *guarantee* that the product will continuously adhere for 12 hours is implausible both based on dictionary definitions and clear precedent dismissing advertising claims involving the use of "up to:"

*First*, "up to" does not mean "at least" but is a qualifier that indicates a limit.  *See Up To*, Merriam-Webster, https://www.merriam-webster.com/dictionary/up%20to (last visited July 28, 2022) (defining "up to" "as a function word to indicate a limit or boundary"); *Up To*, Cambridge Dictionary,  https://dictionary.cambridge.org/us/dictionary/english/up-to  (last  visited  July  28,

2022) (indicating that "up to" is "used to say that something is less than or equal to but not more than a stated value, number, or level").

*Second*, the Second Circuit and district courts considering "up to" in the context of the reasonable consumer standard have routinely rejected plaintiffs' attempts to argue that "up to" means "at least" or operates as a guarantee. *See, e.g.*, *Fink*, 714 F.3d 739 at n.3 (holding that "up to 3 times the speed of most standard DSL packages and up to 100x faster than dial-up" cannot support the claims because "the phrase 'up to' would 'lead a reasonable consumer to expect that speeds could be less than the advertised "3x faster" and "100x faster" speeds.'" (quoting *Fink*, 837 F. Supp. 2d at 283–84); *Turk v. Rubbermaid Inc.*, No. 21-CV-270 (KMK), 2022 WL 836894, at *8 (S.D.N.Y. Mar. 21, 2022) (finding that the plaintiff's argument that a reasonable consumer would interpret "retains ice for *up to* 5 days at 90 degrees F" to mean "retains ice for *at least* 5 days at 90 degrees F" is "simply not plausible"); *Brodsky v. Aldi Inc.*, No. 20 C 7632, 2021 WL 4439304, at *5 (N.D. Ill. Sept. 28, 2021) ("Here, no reasonable consumer would understand the "up to" language to be a guarantee. This language is not a promise that the cannister will make that amount, but just that it can under certain circumstances."); *Sorin v. Folger Coffee Co.*, No. 20-80897-CV, 2021 WL 5545292, at *2 (S.D. Fla. Mar. 5, 2021) ("'Up to' a certain number of cups of coffee would lead a reasonable consumer to expect that the actual number of coffee cups produced could be less. 'Up to' is not a guarantee that the number of cups will be reached.").

*Third*, Plaintiffs' strained view that "up to" operates as guarantee is also unreasonable in light of the larger context of the entire label and reasonable consumers' understanding of how adhesive patches that attach using a sticky side work.  Consumers are directed in the "Directions" section of the product packaging to: "Apply sticky side of patch to affected area. Use one patch for up to 12 hours."  *See supra* n.1.  The context of this statement makes it clear that "up to 12

hours" operates as an indicator for the longest permitted period of use, akin to "do not use for more than 12 hours"—not an assurance for how long the sticky patch will adhere, or a guarantee that it will *continuously* adhere for a specific amount of the time. *See id.* That "up to 12 hours" is a direction for use, not a guarantee, is bolstered by the fact that the Products indicate that they are for "temporary" pain relief, meaning lasting for a limited time. *See* AC ¶ 3; *supra* n.1; *see also Temporary*, Merriam Webster, https://www.merriam-webster.com/dictionary/temporary (last visited July 28, 2022).

Indeed, reasonable consumers exercising common sense would understand that a variety of factors could impact how long a patch with a single sticky side remains in place, including where it is placed (*e.g.*, on a very mobile area, like a knee or elbow), by what the person is doing, and by the condition of each person's skin where the patch is applied. Contrary to Plaintiffs' allegation, the labels do not represent that the Patch Products will "stay put" for "12 hours" or "stay put" for any amount of time. *See* AC ¶¶ 3, 26. A reasonable consumer would understand that the Patch Products can only be used for a limited time, but no more than 12 hours, and that there is no guarantee for how long the Patch Products will adhere in each instance.

### D.    Plaintiffs' Claims Regarding the Cream Products Should Be Dismissed

Plaintiffs' claims concerning the Cream Products also independently fail for other reasons. For the Cream, only Plaintiff Brown alleges that she purchased this Product. *See* AC ¶ 11. But the Amended Complaint does not identify any misrepresentations whatsoever regarding this Product or allege any basis for an injury. *See id.* As an image of the front label shows, the Cream does not contain any of the three statements that Plaintiffs identify in their Amended Complaint, but instead states "Max Strength." *See id.* ¶ 3. Critically, the Amended Complaint does not include any allegations regarding this statement, nor does the Amended Complaint allege that Plaintiff

Brown relied upon or was misled by this statement or any others that appear on the label.  *See*

*generally* AC.  Though Plaintiffs may argue that "Max Strength" is a version of "Maximum

Strength," what is missing from their pleading is the logical step to explain how Plaintiff Brown

and consumers connect these two statements in their minds to understand what "Max Strength"

means.  And even if she were to make such allegations, such a claim would fail for all the same

reasons that the "Maximum Strength" allegations on the other Products fail, as set forth above.

Plaintiffs simply have not alleged a consumer claim concerning the Cream.  *See Maurizio*, 230

F.3d at 521.

Moreover, Plaintiffs do not allege that they even purchased the Cream Roll-on.  *See* AC ¶¶

10–12.  Plaintiffs merely seek to lump this product in with the Patch Products.  It is well-settled

that named plaintiffs do not have standing just because they have brought a case as a putative class

action under Fed. R. Civ. P. 12(b)(1): "That a suit may be a class action  . . . adds nothing to the

question of standing, for even named plaintiffs who represent a class 'must allege and show that

they personally have been injured, not that injury has been suffered by other, unidentified members

of the class . . . they purport to represent.'"  *Lewis v. Casey,* 518 U.S. 343, 357 (1996) (quoting

*Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 40, n.20 (1976)); *Warth v. Seldin*, 422

U.S. 490, 502 (1975). The named Plaintiffs allege no injury from the Cream Roll-on, and thus,

lack standing to pursue claims related to that product.

To the extent Plaintiffs contend that the Cream Roll-on is similar enough to other products

to somehow provide them with standing, they are wrong.  Not only does the fundamental rule of

standing not change because a case is brought as a putative class action, but even if, *arguendo*, it

did, the Cream Roll-on differs from the Patch Products in several significant respects.  The product

involves a different mechanism for external application—a cream, and roll-on device—so its use,

label, directions, and total ingredients (including inactive ingredients) all differ from the Patch Products.  *See* AC ¶ 3; *supra* n.1.  Additionally, two of the statements at issue in this action— "Stay-put flexible patch" and "Lasts Up to 12 Hours"—do not appear on this product, rendering the vast majority of Plaintiffs' allegations concerning these statements and transdermal delivery systems like adhesive patches are inapplicable.  *See, e.g.*, AC ¶¶ 14–17, 20–23, 26–27, 29–36. Additionally, as Plaintiffs point out, the amount of the active ingredient or strength of dosage is calculated differently for creams than it is for patch products.  *See id.* ¶ 21.  The products are simply too different to implicate a nearly identical set of concerns.  *See DiMuro v. Clinique Labs., LLC*, 572 F. App'x 27, 29 (2d Cir. 2014) (finding that dismissal was appropriate where "we cannot say that 'claims brought by a purchaser of' one product 'would raise a "set of concerns" nearly identical to that of a purchaser' of another [] product"); *Hart*, 2016 WL 2642228, at *4 ("The implicit lesson in *DiMuro* is that *NECA* did not give plaintiffs—and their counsel—free reign to bring lawsuits regarding products they never purchased.").

### E.    Plaintiffs Have Not Alleged a Viable Omissions Claim

To the extent that Plaintiffs allege a deception by omission claim, the Amended Complaint is woefully deficient.  Notably, Plaintiffs do not allege what, if any, information was omitted from the product labels, but allege omissions generally referring to Defendant's "misrepresentations and omissions."  AC ¶¶ 43, 65, 75, 82–83.  The only allegation which even arguably describes an omission is where Plaintiffs allege that the label should have stated that the patches could detach during exercise.  *Id.* ¶ 36.  But clearly Walmart is under no obligation to state the obvious.  *See Young v. L'Oreal, Inc.*, No. 21-CV-0446-GHW-KHP, 2021 WL 2295625, at *4, 8 (S.D.N.Y. May 20, 2021), *report and recommendation adopted sub nom. Young v. L'Oreal USA, Inc.*, No. 1:21- CV-00446-GHW, 2021 WL 2292341 (S.D.N.Y. June 4, 2021) (holding that because consumers

know how pump dispensers work, and it is obvious that consumers will not be able to extract every bit of a product from such containers, plaintiffs' theory of omission about the failure of the dispenser pumps to dispense all of the product is implausible).

And the general allegations do not suffice to even put Defendant on notice of what the purported omissions are under Fed. R. Civ. P. 8, let alone state an omission claim. *See Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012) (stating that Fed. R. Civ. P. 8 "requires factual allegations that are sufficient to give the defendants fair notice of what the ... claim is and the grounds upon which it rests." (quoting *Twombly*, 550 U.S. at 555)); *see also Klestinez v. ACT Team*, 6:21-CV-696-GLS-ATB, 2021 WL 4086128, at *5 (N.D.N.Y. Aug. 19, 2021) (noting that to satisfy the minimal requirements of Rule 8, a plaintiff "must provide brief, coherent statements giving notice of what the named defendant did or failed to do, and how those acts or omissions caused plaintiff injury."), *report and recommendation adopted*, No. 621-CV-696-GLS-ATB, 2021 WL 4084270 (N.D.N.Y. Sept. 8, 2021).

Rather, to plead an actionable omission claim, Plaintiffs must plausibly allege that Walmart alone possessed material information and failed to provide that information to consumers. *See, e.g.*, *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 26 (1995); *In re Sling Media Slingbox Advert. Litig.*, 202 F. Supp. 3d 352, 359 (S.D.N.Y. 2016). The Amended Complaint utterly fails to make any such allegation against Walmart, as it does not allege that Walmart alone possessed any particular information about the Products, what that material information was, or that Walmart failed to disclose or actively concealed the information. *See generally* AC.

### F.    Plaintiffs' Claims Under Other State Consumer Protection Statutes Also Fail

Because Plaintiffs' Section 349 and 350 claims fail, so, too, does their second cause of

action, which alleges violations of state consumer protection statutes nationwide.  In addition, Plaintiffs lack standing under Fed. R. Civ. P. 12(b)(1) to pursue claims which they themselves do not possess.  Again, the class nature of the action does alter the basic requirement of standing that a plaintiff allege their own injury traceable to the actions of the defendant.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  Indeed, as numerous courts have recognized, "where plaintiffs themselves do not state a claim under their respective state's consumer statutes ... they do not have standing to bring claims under other state statutes—even where they are named plaintiffs in a purported class action."  *Gould v. Helen of Troy Ltd.*, No. 16 CIV. 2033 (GBD), 2017 WL 1319810, at *6 (S.D.N.Y. Mar. 30, 2017) (internal citation omitted));  *accord Chung v. Pure Fishing, Inc.*, No. 20-CV-3983-RPK-CLP, 2022 WL 866769, at *7 (E.D.N.Y. Mar. 23, 2022);  *Simington v. Lease Fin. Grp., LLC*, No. 10 CIV. 6052 KBF, 2012 WL 651130, at *9 (S.D.N.Y. Feb. 28, 2012).[9]

In opposition, Plaintiffs will undoubtedly rely heavily upon three cases from the same court in the Northern District of California: *Scilex Pharms., Inc. v. Sanofi-Aventis U.S. LLC*, No. 21-1280, 2021 WL 3417590 (N.D. Cal. Aug. 5, 2021) (Tigar, J.), and the two related tag along cases that merely recite *Scilex*'s reasoning.  *See Ablaza v. Sanofi-Aventis U.S. LLC*, Case No. 21-cv-01942-JST (July 12, 2022), ECF No. 66 (Tigar, J.); *Hrapoff v. Hisamitsu America, Inc.*, No. 21-1943, 2022 WL 2168076 (N.D. Cal. June 16, 2022) (Tigar, J.).  But these decisions are readily distinguishable.  All three cases involved different products with different labels marketed by pharmaceutical companies.  None of the cases involved a retailer, like Walmart.  And in *Scilex* and

---

[9] It is also worth noting that many of the other states' consumer fraud statutes require a particularized pleading under Fed. R. Civ. P. 9(b), which clearly is not met here.  *See, e.g., Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (stating that Rule 9(b)'s heightened pleading standards apply to claims under California's state consumer statutes).

*Hrapoff*, the defendant explicitly compared its patches to prescription products, including claiming that its patches "us[e] the same hydrogel technology" and that the "only change they made was to improve the price."   *Scilex*, 552 F. Supp. 3d at 912, 922.   Neither Defendant nor the Products make any claims about or references to prescription products.   Rather, the Products' labels do the exact opposite and prominently compare themselves to other OTC products, rendering the California cases inapposite.

## II.   PLAINTIFFS' UNJUST ENRICHMENT CLAIM FAILS

Under New York law, in order to avoid dismissal of an unjust enrichment claim, a plaintiff must plausibly allege that "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered."   *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516 (2012) (internal citation omitted).   As New York's Court of Appeals has pointed out, "unjust enrichment is not a catchall cause of action to be used when others fail."   *Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790 (2012).   Rather, "[i]t is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff."   *Id.*

Plaintiffs' unjust enrichment claim does not differ in any material respect from their other claims.   *See* AC ¶¶ 55–58.   Plaintiffs merely refer to the same allegations underlying their other claims.   *Id.* ¶ 57.   However, as courts in this district, including this Court, have recognized, claims for unjust enrichment, even when pled in the alternative, cannot survive a motion to dismiss where the plaintiff fails to explain how their unjust enrichment claim is not merely duplicative of their other claims.   *See, e.g.*, *Woodhams v. Pfizer, Inc.*, No. 18-CV-3990 (JPO), 2021 WL 5304309, at *5 (S.D.N.Y. Nov. 15, 2021) (Oetken, J.); *Pauwels v. Deloitte LLP*, No. 19-CV-2313 (RA), 2020

WL 818742, at *15 (S.D.N.Y. Feb. 19, 2020); *Green v. Covidien LP*, No. 18 CIV. 2939 (PGG), 2019 WL 4142480, at *9 (S.D.N.Y. Aug. 30, 2019); *Nelson v. MillerCoors, LLC*, 246 F. Supp. 3d 666, 679 (E.D.N.Y. 2017).

Furthermore, because unjust enrichment is an equitable remedy, Plaintiffs' acknowledgement that monetary damages are adequate precludes their unjust enrichment claim. *See Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 400 F. App'x 611, 613 (2d Cir. 2010) ("Unjust enrichment is an equitable claim that is unavailable where an adequate remedy at law exists.").

Accordingly, the unjust enrichment claim should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant its motion to dismiss the Amended Complaint in its entirety with prejudice.

Dated: July 29, 2022    Respectfully submitted,
     New York, NY

By:   /s/ Deborah H. Renner     
     Deborah H. Renner
     John R. Vales
     Sara Gates
     DENTONS US LLP
     1221 Avenue of the Americas
     New York, NY 10020
     Tel.: (212) 768-6700
     Fax: (212) 768-6800
     deborah.renner@dentons.com
     john.vales@dentons.com
     sara.gates@dentons.com

     *Attorneys for Defendant Walmart Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Deborah H. Renner, hereby certify that on July 29, 2022, a true and correct copy of the foregoing document was served on all counsel of record who have consented to electronic service via the Court's CM/ECF system.

/s/ Deborah H. Renner